## KIRKER et al. v. OWINGS et al.

### (Circuit Court of Appeals, Sixth Circuit. July 5, 1899.)

### No. 659.

1. RECEIVERS—ENFORCEMENT OF BONDS — SUMMARY DECREE AGAINST SURETY.

A court of equity, appointing a receiver, and taking from him merely a common-law bond, conditioned for the faithful discharge of his duties and a compliance with the orders of the court, is not justified by the precedents in entering a summary decree against the surety for a default of the receiver. Unless such power is reserved in the bond itself, or by statute or rule of court, the obligation of the surety is one which can be enforced only in a court of law.

2. SAME—ACCOUNTING—CHARGING RECEIVER WITH PERSONAL LIABILITY.

A receiver for a corporation, who by leave of court continued the performance of a contract previously made by the corporation, by the terms of which a certain portion of the amount earned thereunder by the corporation was to be retained by the other party, and applied on an indebtedness of the corporation for which such other party held a lien on certain of its property, of which fact the court was not advised, and who, after paying a considerable amount on the lien in such manner, sold the property to the lienholder for a small sum in addition to the lien, without leave of the court, and leaving unpaid debts incurred by him for current expenses in performance of the contract, and also leaving equities between the corporation and the lienholder, which might have reduced the amount of the lien, unadjusted, was properly charged by the court personally with payment of such unpaid debts of the receivership.

3. SAME—ANCILLARY RECEIVERSHIPS—RELATION TO PRIMARY SUIT.

Where a court in proceedings for an ancillary receivership appoints as receiver for the property within its jurisdiction the same person appointed in the primary suit, such receiver becomes its own, as to the administration of such property, and must be governed entirely by its orders. In such case each court acts independently within its own jurisdiction, and the relation between them is merely one of comity. The court in which the primary suit is pending has no jurisdiction over property in the custody of the other; and where, under its order, the receiver sells such property, and returns the proceeds to that court, without the knowledge and concurrence of the court by whose orders the property was placed in his possession, and leaving unpaid expenses incurred by him in the ancillary receivership, he may properly be charged, as ancillary receiver, with personal liability for such expenses, and the order under which he acted affords him no protection.

4. SAME—ACCOUNTING—ORDER CHARGING RECEIVER WITH PERSONAL LIABILITY.

Where, on his accounting, a receiver is charged personally with the payment of debts incurred by him as such receiver, the proper form of order is that he pay such debts, and in default thereof stand committed for contempt, and that the creditors have leave to bring suit on his bond against him and his surety.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is an appeal from a decree of the circuit court for the payment of $1,300 against E. C. Kirker, personally, and S. T. Dewees, the surety on Kirker's bond as receiver of the court. The decree was entered in the suit in which Kirker had been appointed receiver. The suit was begun, by what was termed an "ancillary bill," by Robert Ballard, trustee, against the Ella Layman Towboat Company. Ballard averred that he was a citizen of Ohio, and that the Ella Layman Towboat Company, the defendant, was organized under the laws of the state of West Virginia for the business of towing and freighting coal and other commodities, and owning a number of steamboats and barges, and other plants and appliances incident to such business; that on November

23, 1896, the company had made an assignment to complainant for the benefit of creditors; that among the assets assigned was the steamboat Springhill, nine barges, and one flat, all of which were then in the Tennessee river. The remaining averments of the bill were as follows: "Your orator further shows that as the creditors of the said company are not mentioned in said trust deed, as the same gives no directions as to the manner, time, and terms of disposing of the same, it is necessary, in order that said trust may be properly executed and the proceeds of the trust properly disbursed, that the creditors of the said company should be ascertained by proper proceedings under your honors' direction and protection; your orator being ignorant of the names of said creditors, and the amounts of their claims. And it is also proper for the protection of your orator, and the due discharge of his duties as trustee, that he should have the advice and direction of this honorable court, and that said trust should be administered under its directions. Your orator further represents that he is informed, believes, and charges, that said company has on its hands a number of contracts for towing and freighting, two of which are for conveying coal from Greenville, Miss., to New Orleans and other Southern points, and for towing iron ore on the Tennessee river, which contracts are both profitable ones to the company, out of which it has been making money, and which have yet some time to run; that, as your orator is informed, believes, and charges, it will be to the advantage of the creditors of said company to carry out these contracts and others, and, pending the sale of this company's property, to keep the same occupied in a continuance of the towing and freighting business of this company. And on account of the character of the trust property and the use which your orator believes should be made of it pending its disposal, it is, in your orator's judgment, best that a receiver be appointed by this court to take charge and possession of all said property, and manage and dispose of it under the direction of your honors, which receiver should be a competent river man, acquainted with the character of the business of said company. Complainant charges that an original general creditors' bill has been filed by complainant in the United States circuit court for West Virginia, and a receiver appointed therein, and complainant asks that the receivership be extended over the property in Tennessee under this ancillary bill. Your orator therefore prays that the creditors of said company, and the amounts and priorities of their claims, may be ascertained under the direction of your honors' court; that a receiver may be appointed to take charge and possession of said trust property, and to use, manage, and dispose of the same under your honors' direction; that all proper accounts be directed, and decrees entered; and for such other, further, and general relief and decree as the equity of the case may require, and to your honors may seem meet."

On the same day that the bill was filed a certified copy of the order by the circuit court for the district of West Virginia was filed, which, after reciting that actions had been brought against the defendant company in the circuit court of Roane county, Tenn., and attachments had been issued and levied upon the steamer Springhill, and that the loss of the use of the steamer would be fatal to the profitable contract which the defendant company had for towing upon said Tennessee river, authorized the receiver to remove the case from the circuit court of Roane county to the circuit court for the Eastern district of Tennessee, and to give bond in the attachment suit for the release of the steamer Springhill, and to use the same in the towing contract on the Tennessee river. Upon the tendering of the bill and the order the court below allowed the bill to be filed, and made the following order: "The complainant is allowed to file the ancillary bill presented, and this cause will be taken and considered as ancillary to the original bill in West Virginia. The order of Judge Jackson, of December 5, 1896, will be filed in this cause as part of the record; and thereupon this cause came on to be heard on this 11th day of December, 1896, before Hon. C. D. Clark, judge, etc., upon the motion of complainant for the appointment of a receiver for the property attached; and, it appearing to the court that this is a proper case for the appointment of a receiver, it is ordered by the court that E. C. Kirker, who appears to the court to be a proper and fit person, be, and he is hereby, appointed receiver in this case, and required to give bond in the sum of $4,000; and he is au-

thorized to take possession of the property attached, and the other property of defendant in this state, and hold the same subject to the further orders of the court in this case. And because it appears further to the court, from the admissions of both parties, that the defendant Ella Layman Towboat Company has made a general assignment for the benefit of creditors to Robert Ballard, trustee, and that said Robert Ballard, trustee, has filed a general creditors' bill to wind up the business and affairs of said Ella Layman Towboat Company, in the United States circuit court for West Virginia, and that under said bill said E. C. Kirker has been appointed receiver, and has taken possession of the property of said Ella Layman Towboat Company, except the property attached in this cause; and because it appears further to the court, from the statements of counsel for the parties, that said towboat company has a contract for towing ore on the Tennessee river from points near Kingston to South Pittsburg, which contract is believed to be profitable and advantageous to the creditors of said towboat company, to have the same carried out, and that it is impossible to carry out said contract unless said E. C. Kirker, as receiver, is allowed to use the steamer Springhill, upon which the attachment has been levied by James Heekin & Co.,—it is therefore ordered by the court that said E. C. Kirker be allowed to make all proper and necessary use of said steamer Springhill in towing said ore and carrying on said contract. and doing such other work on said Tennessee river and tributaries as it is legitimate for a steamer to engage in. But the said E. C. Kirker, receiver, is ordered and required to keep said steamer in good repair, and to keep the same insured in the sum of five thousand dollars (5,000), so that in the event said steamer should be destroyed by fire the amount of said insurance received shall be paid into this court, to stand in lieu and stead of said steamer, to await the determination of this suit. Said steamer shall not be taken out of the state of Tennessee, unless authorized by further order of the court. Said E. C. Kirker will be required to give bond in the sum of $4,000, to be approved by the clerk of the court, for the faithful discharge of his duties in this case."

On December 14th, Kirker filed the following bond:

"In the Circuit Court of the United States for the Southern Division of the Eastern District of Tennessee.

"This undertaking, made and entered into the 14th day of December, 1896, witnesseth, that we (E. C. Kirker, as principal, and Samuel T. Dewees, as security) do promise and undertake to and with the parties in interest in said cause, for the benefit of whom it may concern, in the penal sum of $4,000, that E. C. Kirker will well and faithfully discharge the duties of receiver of the property and estates of the defendant company, particularly described in the bill in the above-described cause, and obey all orders of the court herein. Witness our hands and seals this 14th day of December, 1896.

"E. C. Kirker,
"Samuel T. Dewees.

"Acknowledged before and approved by me this 14th day of December, 1896. Henry O. Ewing, Clerk."

On the 27th of September, 1897, Kirker, the receiver, made the following report to the court: "Your receiver begs leave to submit the following report in reference to the business and management of the property of the Ella Layman Towboat Company, embracing the jurisdiction of your honor's court: Exhibit No. 1 is a statement of the expenditures and receipts from November 24, 1896, to September 1, 1897; also, statement of the amount of ore delivered at South Pittsburg, and the amount obtained by Roberts, Sparks & Co. out of said shipments, to be applied on payment for barges; and shows, also, profit and loss, showing the net amount of the earnings of the steamer Springhill to have been $2,500.81, showing the payment on the barge account to have been $747.75 in excess of the earnings of the boat. When your receiver took charge of the business, he was confident that the steamer could be run, and made to pay expenses and repairs to the boat, and allow the application to the barge account as provided in the contract with Roberts, Sparks & Co.; but, on account of the various unexpected accidents that are shown in the report hereinafter,

the expectation of the receiver has not been realized, and the facts shown in this report show that the receiver cannot run this business at a profit, and continue payments on the barges. The receiver, as hereinafter stated, has therefore stopped the work under this contract until he can have instructions from your honor as to his proceeding. * * * The receiver submits to your honor whether or not the claim of Roberts, Sparks & Co. should not be required to be credited with $1,200, the price paid for the barge which was sunk by them in loading, and which they did not raise, and which the receiver has not been able to raise, on account of the want of funds, and also whether or not they should not be charged with the value of the fuel barge which was broken up by Messrs. Roberts, Sparks & Co., allowing one of the loaded barges to get away from them at Round Island in March, 1897. * * * In Tennessee river, flat E. L. T. B. Co., No. 5, was lost under the following circumstances: Capt. Butler, in command of the Springhill, writes, under date of March 11, 1897: 'Roberts, Sparks & Co. let one of our barges get away from Round Island last Sunday morning. * * * When it broke loose it ran into our full flat, and broke it all to pieces.' Property erroneously reported as being among the assets of the said Ella Layman Towboat Company, barge H, in Tennessee river, was sunk in August, 1896, while being loaded at ore dock, but was reported as being in condition to load when repaired. Roberts, Sparks & Co. have failed to raise [repair] it, and your receiver has not had use of nor possession of it. The property on hand is the Str. Springhill, insured for $5,000, on $7,500 valuation made by insurance underwriters; barges A, B, C, D, E, F, G, I, upon which the Ella Layman Towboat Company had paid $2,665.20, and on which your receiver has paid $3,248.56, leaving a balance due to be paid, $4,886.24, with interest. These barges were purchased new in December, 1895, at a cost of $1,200 each. Owing to the depressed condition of steamboat business, and the prices obtained from sale of barges in Miss. river, and prices bid on steamboats and barges in Kanawha river, your receiver would value property at about $5,000."

The exhibits attached to the report, which included the contract with Roberts, Sparks & Co., showed that the expenditures had been $6,585.81; that the earnings under the contract and otherwise had been $9,085.84, making an apparent profit of $2,500.03; but that the receiver did not have this on hand, because, complying with the terms of the contract with Roberts, Sparks & Co., he had allowed that company to retain out of the earnings $3,248.56, which was 20 cents a ton upon every ton of ore carried, to apply on the price of the barges. The receiver, by this report, had thus incurred $747 indebtedness in excess of his earnings, though he had reduced the lien upon the barges $3,248. It further appeared from this report that the barges cost $10,800, that the towboat company, before its assignment, had paid thereon $2,655, and the receiver had applied thereon $3,248, which left still due upon the barges $4,897. Thereafter, on October 9, 1897, the steamboat Springhill was ordered sold. Meantime the creditors of the receiver filed their claims in the circuit court, asking to be allowed payment thereof. The court then referred the case to a master to report, among other facts, "What debts and liabilities had been incurred by the receiver since the receiver had been in charge of the property in his hands in Tennessee, and what the assets of said towboat company within the jurisdiction of this court consisted of, and where the same were located." Upon the reference the master reported that the debts of the steamer Springhill amounted to upward of $5,000, and that the debts of the receiver remaining unpaid amounted to about $1,300. The master further reported that, at the time of the appointment of the receiver in this cause, the said receiver took into his possession the steamboat Springhill, as well as nine barges and one flat, and the record failed to show what had become of the barges and the flat; that an order of sale had been obtained, and advertisement made, for the steamer Springhill, and that no mention had been made of the equity of the receiver in the said barges and the flat as being for sale; that the receiver had filed a petition in this cause, and asked to continue the carrying out of what was alleged to be an advantageous and profitable contract for towing with Roberts, Sparks & Co., and the said petition was granted, but the said petition failed to set out that the earnings of the receiver for this work were to be applied by him as payments on the balance due on these

barges, and yet this was what had been done; that it was within the power of the court to refuse to ratify and approve these actions of the receiver, and perhaps to compel Roberts, Sparks & Co. to pay into court a part, if not the whole, of said $3,248.56 thus applied on the contract. Subsequently the steamer Springhill was sold for $1,200 to the Diamond Transportation Company, and the sale was confirmed. Thereafter one of the creditors of the receiver excepted to his report above referred to as follows: "(1) Because the receiver has not accounted for all the property which came into his hands as receiver. The nine barges and flat he has suffered to be taken from him, and has not accounted for the same, and he should be charged with the full value thereof. (2) Because he has paid to Roberts, Sparks & Co. the sum of thirty-two hundred forty-eight and fifty-six one-hundredths dollars ($3,248.56), without any authority and without order of this court, and the same ought to be paid into the registry of this court, to be distributed in accordance with the orders to be made in this cause." Another creditor of the receiver, the Lookout Boiler & Manufacturing Company, excepted to the report on the ground that "there could have been no money applicable to the claim of Roberts, Sparks & Co., under a contract existing prior to the receivership, until the receiver paid all of his own claims incurred in the proper administration of his receivership. And the receiver should be required to pay into court enough money to meet the proper claims incurred by him, because he shows he realized much more than a sufficiency for that purpose, but paid the same to Roberts, Sparks & Co."

Thereafter the receiver filed in the court below a certified copy of the order of the circuit court of the United States for the district of West Virginia, reciting the contract of Roberts, Sparks & Co., and directing the receiver to carry it out, and expressly approving the application of 20 cents a ton to the purchase price of the barges. Thereupon the whole case was re-referred to the master, to consider exceptions to the reports of the receiver, and any additional proof offered. The master was further directed to report what were the debts of E. C. Kirker, receiver, and whether the crediting of 20 cents a ton under the Roberts-Sparks contract was authorized by the orders in this case. He was further directed to report whether or not the complainants in this cause, or the receiver and his bondsmen, were liable for the debts contracted by the receiver during his receivership. Thereafter evidence of witnesses was heard,—among others, that of Kirker, the receiver, in which he explained the failure to make greater profit out of the contract by accidents to the Springhill, and by low water. He stated that he sold the barges by order of the United States court for the district of West Virginia. He further testified that there was a fund of $4,700 in the circuit court of West Virginia, realized from the sale of the property and collection of the assets of the towboat company, and that none of the money had been distributed. He stated that he thought the circuit court of West Virginia had "granted a decree guarantying a bondsman" in the receivership suit in the court below. He said he did not know that the towing contract was unprofitable until he came to Tennessee, in August, 1897, and that he thereupon applied to the court. The last question asked him was: "The barges you sold by order of the court in West Virginia, were they not all the time in Tennessee? Ans. The barges were in Tennessee river all the time." The master reported that the West Virginia court made an order authorizing and directing the said receiver to continue the towing contract, by which 20 cents per ton was to be applied on the purchase price of the barges, and a copy of the said order filed in this cause shows that the nature of this contract was fully understood by the West Virginia court; that application was made by the receiver to the court below to continue the contract, and permission was given, but that there was no evidence before the master that it had been disclosed to the court that 40 per cent. of the freight, or 20 cents per ton, was to be applied on account of the purchase price of the barges; that the barges had been sold at private sale by order of the West Virginia court, without any authority from the court below; that the price had not been shown in the evidence before the master; that the unpaid debts of the receiver amounted to $1,083.50, together with certain small additions, which the master could not report upon at the time. The master reported that, in his opinion, the sale of the barges without any order from this court was void; that the court below had full authority to resume cus-

tody of them; and, if that was not practicable, there existed a liability against E. C. Kirker, receiver, and his bondsman, S. T. Dewees.

Thereupon the receiver excepted to the report, and filed a certified copy of the proceedings of the district court of West Virginia, in which it appeared that Roberts, Sparks & Co. had offered $50 cash for all the barges, subject to the mortgage of said Roberts, Sparks & Co., and that the receiver had been directed to accept this offer, and the sale had been approved. The cause then came on before the court upon the report of the master, and the exceptions of E. C. Kirker, receiver, and the court made the following order: "And thereupon the court is pleased to, and does hereby, overrule the exceptions of E. C. Kirker, receiver, to the report filed May 12, 1898, and confirm said report, for the reason that the court is of the opinion, and so adjudges and decrees, that the action of the receiver in disposing of the barges mentioned in said report, without authority from this court, was improper; it appearing from the record that said barges came into the custody of the receiver under the orders of this court, and that they were within its jurisdiction and under its control when they were disposed of. But because it appears that said receiver in making said sale was acting under the orders and decrees of the circuit court of the United States for the district of West Virginia, which court, under a misapprehension of the facts, authorized and instructed the receiver to sell said barges, as being within its jurisdiction and under its control,' and that said receiver was acting in good faith, and was guilty of no intentional wrong or breach of his trust in making the sale, the court is further of the opinion, and so adjudges, that the unpaid debts due from the receiver, as shown by the master's reports hereinbefore filed, should be paid in the first instance out of the trust funds realized in the cause of Robert Ballard, Trustee, v. Ella Layman Towboat Company, in the circuit court of the district of West Virginia, if any funds are available for that purpose in said cause. And to this end the clerk of this court will certify so much of the record in this cause as may be necessary to show the action of this court on said question, and its reasons therefor, and the amount of the outstanding claims against said receiver, to the West Virginia court, for such action as it may be pleased to take in the premises. It is further ordered, adjudged, and decreed that the following named parties have and recover of the receiver, E. C. Kirker, and S. T. Dewees, the surety on his bond as such, the sums placed opposite their respective names; the same being unpaid debts contracted by said receiver, as heretofore fixed by the special master in his reports filed in the cause: [Here follows a list of claims of the creditors of the receiver.] But no execution will issue on said judgment until the expiration of sixty days from the date of this decree, after which, unless said amounts are paid into court, an execution will issue in this cause, for the aggregate amount of said claims, against said E. C. Kirker and S. T. Dewees, and when collected the same will be paid to the parties entitled. The said E. C. Kirker and S. T. Dewees objected at the hearing to the rendition of any judgment against them, because the said Kirker had acted, in making sale of the barges in question, in good faith, and under the orders of a court of competent jurisdiction, assuming the right to control and direct the disposition of said barges, and also because there was nothing in the record to show that said barges were worth as much as the amount adjudged against the receiver and his bondsman, which objections were by the court overruled; and to the action of the court in overruling said objections, and in rendering judgment against them as aforesaid, said E. C. Kirker and S. T. Dewees then and there excepted.

From this order the receiver, Kirker, and his surety, Dewees, appealed, and assigned the following errors: "First. Because there are no pleadings and no evidence in the record to justify the rendition against appellants of the several judgments contained in the second paragraph of said decree, or any of them. Second. Because in said decree judgments are rendered against appellant for sums aggregating over $1,300, on the ground, as stated in the decree, that the receiver had wrongfully sold and disposed of certain barges, the proceeds of which were not paid into court, whereas there is no proof that said barges were worth as much as the aggregate of said judgments, or that the receiver realized so much from the sale of them. Third. Because the proof

shows that said barges were sold, under order of the circuit court of the United States for the district of West Virginia, for the sum of fifty dollars; and appellants should not, in any event, be held liable for more than was received for said barges, it being shown that the sale was made in good faith. Fourth. Because it appears that in making sale of said barges the said receiver was acting in obedience to the order of the court by which he was first appointed, and that he disposed of the proceeds of sale in accordance with the orders of said court; and he and his bondsman ought not to be held personally liable for obeying said orders, even though they may have been erroneous."

J. B. Sizer, for appellants.

Frank Spurlock, for appellees.

Before TAFT and LURTON, Circuit Judges, and THOMPSON, District Judge.

TAFT, Circuit Judge (after stating the facts as above). The court below held the receiver personally liable for certain debts incurred by him, because, without authority of the court, he had sold at an inadequate price the property out of which the court might have realized a sufficient sum to have paid the receiver's debts. The court entered a decree in favor of the receiver's creditors, not only against the receiver, but also against the surety upon his bond. It does not appear specifically that the surety was given any notice of the hearing, but it does appear that at the time the order was made the surety appeared and excepted to its validity. No pleadings were filed against the surety upon the bond, and no process issued against him. Three questions are presented on the record: First. Had the court power to make an order against the surety, of this summary character, in the cause in which the bond had been given? Second. Was there evidence upon which the court was justified in directing that the receiver should pay the debts which he had incurred, and which were unpaid? Third. Was it a defense to the receiver in the court below that his sale of the barges was authorized by the circuit court of West Virginia? These questions we shall now consider in their order.

1. The precedents do not justify the practice in equity of giving a summary decree against the surety on the bond of a receiver for the latter's default,—at least, when such power is not reserved in the bond itself, by statute, or by rule of court. In Thurman v. Morgan, 79 Va. 367, a rule was issued by a court appointing the receiver against his administrator. An account was taken, and it appeared that $3,683 was due from the receiver. The report was confirmed, and a rule was issued against the administrator of the receiver and the sureties upon the receiver's bond to show cause why a decree should not be entered against them for the sum found due. They appeared and moved to quash the rule, but the motion was denied, and a decree entered against them for the sum of $3,663.53, with interest and costs. The court of appeals held this to be erroneous, as there was in their hands no fund subject to the order of the court; that they could not be proceeded against except by an action on their bond in a common-law court, where they could make defense in a trial by jury. In the case of Atkinson v. Smith, 89 N C. 72, upon reference, it appeared that the receiver

appointed in the suit had not accounted for $268. The report was confirmed. "Plaintiff then moved for judgment against the receiver and his surety for this amount upon the bond. The court refused this remedy, and an appeal was taken. The action of the court below was sustained by the supreme court, saying:

"The regular course of procedure, according to well-settled practice, in cases like this, is to proceed against the receiver in the first instance, and, if he shall fail in the proper discharge of his duty within the scope of his bond, then to obtain leave of the court to sue upon his bond. It may be that in some cases the surety might, by order of the court, and upon reasonable notice, be brought into the action in which the receiver had been appointed, and proceeded against therein. But this is not the usual course pursued; nor is it to be encouraged, if, indeed, it could be sustained in any case." '

In State v. Gibson, 21 Ark. 140–143, Chief Justice English states the proper course in cases like this to be that the interested party shall apply to the court for a rule against the receiver to render his account; that after the account is adjusted, and approved by the court, the receiver shall be ordered to pay the effects in his hands into court, or to the party entitled to them; that, if he fails to do so, he shall be subject to attachment as for contempt, and he and his sureties become liable to suit upon his bond. See, also, Weems v. Lathrop, 42 Tex. 207–213. The only exception to such a course of proceeding would seem to be where the surety has taken possession of some of the funds which came into the hands of the receiver under orders of the court. In the case of Seidenbach v. Denklespeil, 11 Lea, 297, it was held that because the surety on the receiver's bond had in his hands $500, acquired from the receiver, which he knew to be part of the trust fund, the court had sufficient jurisdiction over him to make an order upon him for the restoration of that sum to the custody of the court. See, also, Bank v. Creditors, 86 N. C. 323; High, Rec. § 129; Gluck & B. Rec. (2d Ed.) p. 430, § 83.

In the English court of chancery the obligation taken by way of security from a receiver for the faithful performance of his duty is not a common-law bond, but is a recognizance. The court of chancery requires the receiver to account, and finds the amount due from him, and orders him to pay the same into court. Upon his failure so to do, he may be proceeded against by attachment, or the parties in interest may apply to the court for leave to sue upon his recognizance. When that leave is granted, the next step is to proceed by writ of scire facias, in the name of the master of the rolls and the senior vice chancellor, or the recognizee named in the recognizance, against the recognizors, who are the receiver and his sureties. This scire facias is a judicial writ founded upon a record, and requires the person against whom it is brought to show cause why he should not pay the debt of record. It is suable in a common-law court. The scire facias is accordingly sued out in the office of the petty bag, on the common-law side of the court of chancery, and is made returnable to some common-law court,—either the court of queen's bench or common pleas or exchequer of pleas,—and in that court, if a defense is made, the issue is tried to a jury. In such proceeding the penalty of the recognizance was the debt, for which execution

would go, should the issue raised upon the writ be determined in favor of the recognizees. Therefore, where the amount of the default of the receiver did not equal the penalty of the recognizance, it was for the advantage of the cognizors, who were sureties, to apply to the court of chancery, out of which general leave had been given to sue, and in which the recognizance had been taken, to stay further proceedings at law on the recognizance upon payment by the cognizors of the exact amount found due by the chancellor from the receiver. This explains why questions with reference to sureties upon receiver's recognizances, and the amount due from them, are so frequently adjudicated in a court of chancery in the cause in which the recognizance was given. A full description of the proper course in the collection of debts due from the receiver upon his recognizance may be found in 2 Daniell, Ch. Prac. (6th Am. Ed., from 6th Eng. Ed.) *1757–*1764. See, also, Thurlow v. Thurlow, 4 Jur. 982, where Lord Langdell, the master of the rolls, says:

"That the usual course where the party applying was an adult, as in this case, was to apply for leave to put the recognizance in suit, and not for a reference to the master to inquire whether it would be proper to do so; and that notice of the application must be personally served on the parties who were liable."

In Walker v. Wild, 1 Madd. 528, the receiver absconded without passing his accounts, though he was duly summoned. Upon application to the master of the rolls, his recognizances were extracted from the record, and an action was brought against the sureties; and in that case a surety, after action brought, applied to the court to restrain all proceedings in the action at law, yielding to the order to pay into the Bank of England the sum found by the master to be due from the receiver in installments. In Dawson v. Raynes, 2 Russ. 466, the sureties of the receiver did not delay until leave was given to sue them on the recognizance, but applied to the court to be allowed to pay in what was due from the receiver, without interest; and the question was whether the sureties were liable for interest. The case was certified to the court of king's bench upon the question whether the sureties in recognizance were bound to pay interest on the trust money which came into the receiver's hands, or any part thereof. The judges certified that, if there had been any breach of the condition of the recognizance, the penalty was the debt at law, and the question of interest did not arise. But the court held that under the peculiar circumstances of the case, and the delay in the prosecution against the receiver, the sureties might be relieved from a suit at law by paying the amount due from the receiver, without interest. In Ludgater v. Channell, 3 Macn. & G. 175, it was held that, upon the death of a receiver without settlement of his accounts, a recognizance might be ordered to be put in suit against his real and personal representatives and against the sureties; and this is the same rule where the receiver absconds. A similar course was taken with reference to the recognizance of a committee in Re Lockey, 1 Phil. Ch. 509.

It has been suggested that there is a close analogy between the power of the court in enforcing receiver's bonds, and that in re-

spect of injunction bonds; and the language of Mr. Justice Bradley in Russell v. Farley, 105 U. S. 433, 26 L. Ed. 1060, has been referred to as justifying summary action by the court taking the injunction bond against the sureties. Russell v. Farley was an appeal in equity, by the respondent below, from that part of a decree dismissing a bill for an injunction which found that no damages were due defendant on the injunction bond. It was held that, as the court had inherent power to impose terms and take security from the party complainant before granting him a preliminary injunction, it had, as incident to such power, the right to modify those terms by declining to per- mit such security to be enforced. Incidentally the learned justice discussed the question whether the court of equity taking security in the form of a bond might itself assess the damages. The power had been denied by Chief Justice Taney in a dictum in Bein v. Heath, 12 How. 168, 179, 13 L. Ed. 939, and by Mr. Justice Curtis, on the circuit, in Merryfield v. Jones, 2 Curt. 306, Fed. Cas. No. 9,486, in a case where the point was in judgment. After referring to these authorities, Mr. Justice Bradley proceeded (page 445, 105 U. S., and page 1064, 26 L. Ed.):

"Other cases are referred to by the counsel of the appellants to sustain their position; but, upon a careful examination, we are not satisfied that they furnish any good authority for disaffirming the power of the court having possession of the case, in the absence of any statute to the contrary, to have the damages assessed under its own direction. This is the ordinary course in the court of chancery in England, by whose practice the courts of the United States are governed, and seems to be in accordance with sound principle. The imposition of terms and conditions upon the parties before the court is an incident to its jurisdiction over the case; and, having possession of the principal case, it is fitting that it should have power to dispose of the incidents arising therein, and thus do complete justice, and put an end to further litigation. We are inclined to think that the court has the power, and that it is an inherent power, which does not depend on any provision in the bond that the party shall abide by such order as the court may make as to damages (which is the usual formula in England) nor on the existence of an express law or rule of court (as adopted in some of the states) that the damages may be ascertained by reference or otherwise, as the court may direct; this being a mere appendage to the principal provision requiring a bond to be taken, and not conferring the power to take one, or to deal with it after it has been taken. But, whilst the court may have (we do not now undertake to decide that it has) the power to assess the damages, yet, if it has that power, it is in its discretion to exercise it, or to leave the parties to an action at law. No doubt, in many cases the latter course would be the more suitable and convenient one."

Now, though this language was not necessary to the cause, it is so weighty that we have felt justified in regarding it as defining the proper practice in respect to injunction bonds in the federal courts. Leslie v. Brown, 32 C. C. A. 556, 90 Fed. 171. But can we extend the practice by analogy to receiver's bonds in cases like the present, in which no power was reserved to the court, on the face of the bond, to assess the damages? We think not. The security tendered by a receiver stands, we think, upon a somewhat different footing from that of a party seeking an injunction. The receiver is invited by a court to assist in the discharge of the duties of the court, and, while he is required to give bond, it is not exacted as a condition of granting him, as a party, any extraordinary relief. The

plenary power of the court of equity to assess the damages in an injunction bond seems, in the view of Mr. Justice Bradley, shown by the language quoted above, and also by the earlier part of the opinion, to arise by necessary implication from the attitude of the complainant towards the court in obtaining preliminary and summary relief, and is found by him to have been exercised by the English courts of chancery for many years. Now, we have seen that no such power has been exercised by the English court of chancery in respect to receiver's recognizances, which are even more formal obligations than mere bonds. The difference in the English practice as to receiver's recognizances and bonds in injunction suits itself sustains the view that they are not entirely analogous. We do not mean to hold that a court may not adopt such a rule, or so frame a receiver's bond, as to reserve to itself the power to assess damages against the receiver and his sureties. Indeed, we are inclined to think this within the court's power. A statute permitting such an assessment of damages on a receiver's bond has been held constitutional in Mississippi. Bank v. Duncan, 52 Miss. 740. All that it is necessary for us here to decide, and all we do decide, is that when the court only takes from a receiver an ordinary common-law bond, with sureties conditioned for the faithful discharge of his duties and a compliance with the orders of the court, the sureties are entitled, in view of all the precedents, to regard their obligation as one which can only be enforced in a court of law. The decree of the court below, in so far as it adjudged a recovery against the surety, was erroneous. This conclusion renders it unnecessary to consider the objection that no pleadings or process issued against the surety. So far as the receiver is concerned, the objection has no weight; for it is clear that he had full notice of the proceedings, for he appeared and testified, and made no objection to the form of the order of reference until after decree.

2. The second question for our consideration is whether there was evidence justifying the court in ordering the receiver, personally, to pay the debts which he had incurred as receiver, and which were unpaid by him. The evidence shows that these debts were incurred in the performance of a towing contract made by the towboat company before its assignment, by which it purchased nine barges and a flat from Roberts, Sparks & Co. for $10,800, and proposed to pay for the same by carrying iron ore for the vendor at the rate of 50 cents a ton, 20 cents thereof to be applied upon the purchase price; that the towboat company had itself thus earned and applied on the purchase price $2,665; that the receiver continued the performance of the contract, and paid the same creditor on the boats $3,248, reducing the amount due on the barges to $4,897; that, in order to earn this credit, the receiver incurred debts, which he was unable to pay, of $1,300; and that he then sold the barges to Roberts, Sparks & Co. for $50, without the authority of the court. It further appears that in his first report he brought to the attention of the court, and submitted to the court, whether Roberts, Sparks & Co. did not owe to his trust considerably more than $1,300, because of the loss of one of the barges and a flat through their negligence.

It is very clear that, so long as the court had in its custody the barges on which Roberts, Sparks & Co. claimed a vendor's lien, the court had within its power to adjust the equities between them, on the one hand, and the towboat company and the receiver, on the other, and that, if his report is to be accepted as true against him, there was a claim against Roberts, Sparks & Co. which ought to have reduced the lien of that company upon the remainder of the barges by an amount sufficient to pay the receiver's debts. Again, the master reports that it was not made to appear to the court below by the receiver that 20 cents a ton of all freight was to apply on the purchase price of the barges. This would have given the court below the right, in adjusting the equities on the barges, to require that, out of the earnings credited, the debts incurred in making them should be paid. More than this, the court might very well have found, from the evidence, that, considering the amount agreed to be paid for the barges, and the amount which had been paid on them, $50 was an altogether inadequate price for the interest which the towboat company and the receiver had in them. The receiver's sales of the barges without the authority of the court below were acts which might properly be taken to color his proceedings, and throw upon him the burden of explaining the tremendous loss of value sustained in the barges. The receiver, after the disastrous season of 1897, reported to the court that he had property of the value of $5,000 in his custody. This included the steamer Spring-hill, which sold for $1,200, and the barges. In view of his reports, a private sale for $50 needed explanation, and his failure to explain amply justified the court below in finding that there was at least enough due from the receiver to require him personally to pay his unpaid debts as receiver. That the power of a court of equity to make such an order upon the receiver is plenary, can hardly be denied. It is amply sustained by the following cases: French v. Harness Co., 184 Pa. St. 161, 39 Atl. 63; Vanderbilt v. Railroad Co., 43 N. J. Eq. 669–686, 12 Atl. 188; Hinckley v. Railroad Co., 100 U. S. 153, 25 L. Ed. 591; In re Union Bank of Jersey City, 37 N. J. Eq. 420; High, Rec. c. 19; Gluck & B. Rec. § 81; Carr's Adm'r v. Morris, 85 Va. 21, 6 S. E. 613; Clapp v. Clapp, 49 Hun, 195, 1 N. Y. Supp. 919.

3. But it is said that the receiver is protected from any liability, because, in carrying out the towing contract, and in the sale of the barges, he was acting under the order of the court of primary jurisdiction,—the circuit court of the United States for the district of West Virginia. We cannot yield to this argument. It is true that the bill which was filed in the circuit court of West Virginia was the original bill, and that the bill filed in the court below was for the purpose of assisting the administration of the trust in the circuit court of West Virginia; but the property which the receiver took possession of, and with respect to which these debts were incurred, was in the jurisdiction of the circuit court for the district of Tennessee, and the receiver applied to that court for orders with respect to that property because it was within the territorial jurisdiction of that court. He accepted an appointment as receiver of that prop-

erty from that court, and his first allegiance in respect to that property, therefore, was to that court. When the circuit court of the Eastern district of Tennessee had taken possession of the property, and the receiver was holding the property as its receiver, the property was beyond the jurisdiction of the circuit court of West Virginia to control by its own orders. The comity which public policy requires to be preserved between courts dealing with the same general trust might have led the court below to make an order carrying out the order of the court of West Virginia to sell the barges at private sale, but for the fact that the barges proposed to be sold were the only property out of which the court could hope to pay the debts which it had authorized the receiver to incur. The court below had an obligation to the creditors who, on the pledge of the court's faith, had advanced money to its officer, and this was higher than the obligation of comity to concur in the order made by the court of West Virginia. That court was far removed from the locus in quo, and much less likely to be advised of the exact situation and the proper policy in the sale of the barges than the court of Tennessee where the property was. But the receiver did not think it necessary to advise the court below that such an order had been made until the barges were sold. The court below went as far as comity required when it directed its clerk to certify the order upon the receiver to the West Virginia court before execution should issue thereon. Thus, the receiver was given 60 days in which to procure from the court of original jurisdiction the means with which to pay the expenses which he had incurred by order of both courts, and which he had deprived himself of the means of paying by an order of the court of West Virginia without authority from the court below. As the circuit court of West Virginia did not see fit to direct the payment out of the funds which it had to meet these obligations, the circuit court for Tennessee had no recourse, save to the personal liability of the receiver. It is a mistake to suppose that where an original creditors' bill is filed against a debtor having property in a number of states, and so-called ancillary bills are filed in other courts of different territorial jurisdiction, the courts exercising the so-called ancillary jurisdiction are compelled to make the same orders as those which are made in the court exercising the original jurisdiction. The whole relation of the two courts is merely one of comity, and when the court of ancillary jurisdiction has authorized its officer to incur debts owing to residents within its jurisdiction, and has impliedly pledged the faith of the court to their payment, it may and ought to exercise a jurisdiction independent of that of the original jurisdiction to secure payment of its debts of administration out of the property within its custody. An order of the court of original jurisdiction which in effect prevents this, it may properly disregard. Undoubtedly, it is necessary that in the management of large properties, extending through various districts, as a unit, there should be one court to determine the general policy thereof; and comity requires that all the other courts should yield on such matters to the opinion of the court of original jurisdiction. But this does not prevent each court, in respect of claims against

a receiver which are purely local in their character, from protecting persons who, on the faith of the court's credit, have advanced money or goods or rendered service to the trust. In such a case comity must yield to justice and right. No case has been cited to us, at all applicable to this case, from which a different conclusion can be drawn. The order of the court below should have been in a different form. It should have directed that the receiver pay the debts incurred by him, mentioned in the order, and that in default thereof he should stand committed for contempt, and that the creditors should have leave to bring suit upon his bond against him and his surety. The decree of the court below is accordingly reversed, with directions to enter an order in the form above stated against the receiver. All the costs of this appeal will be taxed against the receiver.