MANNINGTON et al. v. HOCKING VALLEY RY. CO. et al.

(Circuit Court, S. D. Ohio, E. D. June 13, 1910. On Motion for Temporary Injunction, etc., August 3, 1910.)

(No. 1,527.)

1. COURTS (§ 289*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A suit based on an alleged violation of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), whereby direct and special injuries are inflicted on and threatened to the complainants, is one arising under a law of the United States of which a federal court has jurisdiction regardless of the citizenship of the parties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 830; Dec. Dig. § 289.*

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore Purchasing Co. v. Boston & M. C. C. & S. Min. Co., 35 C. C. A. 7.]

2. REMOVAL OF CAUSES (§ 95*)—PROCEEDINGS FOR AND EFFECT OF REMOVAL—PROCEEDINGS IN STATE COURT AFTER REMOVAL.

The filing of a sufficient petition and bond for removal, in a cause which is removable, ipso facto devests the state court of jurisdiction to proceed further therein except to pass on the sufficiency of the papers, and any further action it may take is coram non judice and void. While a formal order of removal is usual, it is not necessary, nor will the failure of the state court to take any action on the petition prevent the attaching of the jurisdiction of the federal court.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 204, 205; Dec. Dig. § 95.*]

3. INJUNCTION (§ 157*)—ORDERS—WHAT CONSTITUTE—ORAL OPINION OF COURT—"JUDGMENT."

An oral opinion of a judge sustaining a motion for a preliminary injunction is not a "judgment," either under the Ohio statutes or the rule of the federal courts, nor does it become effective as an order and binding on the parties until reduced to writing and entered of record, nor, in Ohio, until bond has been given and approved.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 340, 342; Dec. Dig. § 157.*

For other definitions, see Words and Phrases, vol. 4, pp. 3827–3842; vol. 8, pp. 7695, 7696.]

4. REMOVAL OF CAUSES (§ 114*)—JURISDICTION ACQUIRED BY FEDERAL COURT—MOTIONS PENDING IN STATE COURT.

After the removal of a cause, the federal court has authority to hear and act on a motion pending in the state court at the time of removal to modify or vacate a restraining order or preliminary injunction previously granted.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 241–244; Dec. Dig. § 114.*]

5. RAILROADS (§ 15*)—RIGHT TO REDEEM PREFERRED STOCK—OHIO STATUTE.

Rev. St. Ohio, § 3309b (Gen. Code, § 8805), authorizes railroad corporations to issue preferred stock and to provide in their articles of incorporation terms and provisions of such preferred stock in addition to and not inconsistent with the provisions of section 3309, Rev. St. (Gen. Code, § 8817), which provides, inter alia, that "the company which issues such preferred stock shall reserve the privilege of redeeming and canceling the same at par at any time after three years from the date of its issue." Rev. St. Ohio, § 3264 (Gen. Code, § 8700), which is a part of the general

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

corporation act, provides that the board of directors of a corporation may, "with the written consent of the persons in whose names a majority of the shares of the capital stock stands on the books of the company, reduce the amount of its capital stock, * * * and a certificate of such action shall be filed with the Secretary of State." A railroad company organized under such statutes issued both common and preferred stock, having equal voting power; the preferred being the greater in amount. Its articles of incorporation and each certificate of stock, whether common or preferred, contained a provision that "all the preferred stock is and will be subject to the right of the company to redeem the same at par at any time after three years from the date of its issue." *Held*, that such right of redemption was not only expressly given by statute, but was also a matter of contract between the company and each stockholder, common and preferred, and one which could be exercised by the board of directors as a part of the corporate business which devolved on them without reference to the provisions of Rev. St. Ohio, § 3264 (Gen. Code, § 8700), relating to the reduction of capital stock.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 31; Dec. Dig. § 15.*]

**6.** EVIDENCE (§ 73*)—DIRECTORS—PRESUMPTION IN FAVOR OF LEGALITY AND GOOD FAITH OF ACTS.

In the absence of a showing of the votes cast at a corporate election, the presumption is that the board of directors of a corporation were elected by all of the stockholders, and that the stockholders in so doing acted in their own interest.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 94; Dec. Dig. § 73.*]

**7.** CORPORATIONS (§ 506*)—SUIT INVOLVING RIGHTS OF STOCKHOLDERS—PARTIES.

Where it is claimed that one corporation cannot under the statute lawfully own the stock of another, a court cannot, in a suit to which such stockholding corporation is not a party, adjudge the constitution of the board of directors of the corporation issuing the stock illegal, on the ground that certain of its stock was held and voted at the corporate election by such stockholding corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1959; Dec. Dig. § 506.*]

**8.** CORPORATIONS (§ 389*)—POWERS—HOLDING STOCK IN OTHER CORPORATIONS—BURDEN OF PROOF.

When a corporation asserts that it is clothed with a given power, such as the power to acquire and hold stock in another corporation, the burden rests upon it to show whence such power and right are derived.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1570; Dec. Dig. § 389.*]

**9.** RAILROADS (§ 13*)—PUBLIC OR PRIVATE CORPORATIONS.

A railroad company is a private corporation, but not in the strict sense of the ordinary business corporation, because it is charged with duties of a public nature which distinguish it from the purely and strictly private corporation. In many respects it is a private corporation in all that the term implies; its foundation is private, it is organized for gain, and its strictly private rights are as much beyond legislative control as are the rights of the purely private corporation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 26; Dec. Dig. § 13.*]

**10.** STATUTES (§ 214*)—CONSTRUCTION—LEGISLATIVE INTENT.

In the construction of statutes the intent of the lawmakers must be found in the statutes themselves. The presumption is that language has been employed with sufficient precision to disclose the intent, and, un-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

less an examination overthrows the presumption, nothing remains but to enforce the statute as written.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 290; Dec. Dig. § 214.*]

**11.** STATUTES (§ 217*)—CONSTRUCTION—EXTRINSIC AIDS TO CONSTRUCTION.

In construing statutes the courts should not close their eyes to what they know of the history of the country and of the law, of the condition of the law at a particular time, of the public necessities felt, and other kindred things, for the reason that regard must be had to the words in which the statute is expressed as applied to the facts existing at the time of its enactment.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig. § 217.*]

**12.** RAILROADS (§ 121*)—PURCHASE OF STOCK OF OTHER COMPANIES—OHIO STATUTE.

The amendment of May 6, 1902 to Rev. St. Ohio, § 3256 (95 Ohio Laws, p. 390), now section 8603, Gen. Code, which provides that "private corporation may purchase or otherwise acquire and hold shares of stock in other kindred but not competing corporations, whether domestic or foreign, but this shall not authorize the formation of any trust or combination for the purpose of restricting trade or competition," applies to railroad corporations, such provisions and those of Rev. St. Ohio, § 3300 (Gen. Code, §§ 8806, 8807, 8809), which specifically authorizes railroad companies to subscribe for stock in other companies under certain conditions, being cumulative.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 381–385; Dec. Dig. § 121.*]

**13.** CORPORATIONS (§ 642*) — FOREIGN CORPORATIONS — DOING BUSINESS IN STATE.

The mere ownership of stock by a foreign corporation in a domestic corporation, even if it be a controlling interest, does not constitute the doing of business in the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520–2527; Dec. Dig. § 642.*

Foreign corporations "doing business" in state, see notes to Wagner v. J. & G. Meakin, 33 C. C. A. 585; Ammons v. Brunswick-Balke Collender Co., 72 C. C. A. 622.]

**14.** CORPORATIONS (§§ 376, 440, 460*) — AUTHORITY TO BORROW MONEY—PURPOSE.

Where a corporation has power to purchase its own shares, it may buy them on credit, or may borrow money on mortgage or otherwise to pay for them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1530, 1775–1777, 1813; Dec. Dig. §§ 376, 440, 460.*]

**15.** WORDS AND PHRASES—"REDEEM."

The word "redeem," as used in statutory provisions authorizing a party to redeem, means "repurchase."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, pp. 6022, 6023.]

**16.** RAILROADS (§ 121*)—PURCHASE OF STOCK IN OTHER CORPORATION—"COMPETING LINE."

By the terms of section 8806, Gen. Code Ohio, allowing a railroad to acquire stock in another line, no road or line may be termed competing until it is constructed. Competition as between railroads necessarily relates to transportation, and, in respect to transportation, the term "competing" signifies a road complete and ready for operation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 381–385; Dec. Dig. § 121.*

For other definitions, see Words and Phrases, vol. 2, pp. 1362, 1363.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

17. STATUTES (§ 162*)—REPEAL OF SPECIAL BY GENERAL ACT—RAILROAD COMPANIES—PURCHASE OF STOCK OF OTHER COMPANIES — OHIO STATUTE — "CLEARLY"—"CUMULATIVE."

The provisions of the amendment to Rev. St. Ohio, § 3256, and of section 3300, now sections 8806, 8807, and 8809, Gen. Code, relating to stock purchases and holdings, are clearly cumulative and meet the requirements of section 3269, now section 8733, Gen. Code, reciting that a "special provision shall govern unless it clearly appear that the provisions are cumulative"—the word "clearly" meaning in a clear manner, without obscurity, without entanglement or confusion, without uncertainty; and "cumulative" meaning "additional," that which is superadded to another thing of the same character and not substituted for it.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 235–237; Dec. Dig. § 162.*

For other definitions, see Words and Phrases, vol. 2, pp. 1223, 1783.]

18. CORPORATIONS (§ 631*)—FOREIGN CORPORATIONS—EXERCISE OF CHARTER POWERS—RULE OF COMITY.

In Ohio, as in other states and territories, in harmony with the general rule of comity, the presumption is indulged that a corporation of a foreign state, not forbidden by the law of its being, may exercise within the state the general powers conferred by its own charter, unless it is prohibited from so doing either in the direct legislative enactments of the state, or by its public policy as deduced from the general course of legislation, or from the settled adjudications of its highest court.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 631.*]

In Equity.    Suit by Howard D. Mannington, Fred H. Schoedinger, and Ralph E. Westfall, against the Hocking Valley Railway Company and the Chesapeake & Ohio Railway Company. On motion by defendants to dissolve temporary restraining order and by complainants for preliminary injunction. Order modified, and injunction granted in modified form.

This case is here on removal. The defendant, an Ohio corporation, was organized in 1899 to take over the Columbus, Hocking Valley & Toledo Railway Company, then under foreclosure, and all of its property of whatever kind. To reduce the fixed charges, the plan of reorganization provided for a reduction of the indebtedness to be cared for and the issue of preferred stock as compensation for such reduction. It also provided that: "The preferred stock will be entitled, out of any and all surplus net profits, to noncumulative dividends, whenever declared by the board of directors, at the rate of, but not exceeding four per cent. per annum, for the fiscal year beginning on the first day of January, 1899, and for each and every fiscal year thereafter, payable in preference and priority to any payment of any dividends on the common stock for such fiscal year; in addition thereto, in the event of the dissolution of the corporation, the holders of the preferred stock shall be entitled to receive the par value of the preferred shares out of the surplus funds of the corporation before anything shall be paid therefrom to the holders of the common stock."

The defendant was authorized, under section 3309b, Rev. St. Ohio, chapter on Railroad Corporations (section 8805, Gen. Code), to issue preferred as well as common stock and to provide in its articles of incorporation "terms and conditions of such preferred stock in addition to and not inconsistent with the provisions of section 3309" (section 8817, Gen. Code). Section 3309 provides that: "If preferred stock be issued, the company may guarantee to the holders thereof semiannual or quarterly dividends to an amount not exceeding six per cent. per annum, payable at its office, or at such other place as the directors may designate; the stock may be sold at such time and place, either within or without the state, as may be deemed advisable, and the proceeds thereof applied to the purpose for which it is issued; the unpreferred

stock of the company shall be entitled to dividends only out of the surplus of the profits, after setting apart a sum sufficient to pay the dividends upon the preferred stock, and the company which issues such preferred stock shall reserve the privilege of redeeming and canceling the same at par, at any time after three years from the date of its issue; and the preferred stock herein provided for may be convertible into bonds of the company at the option of the parties."

The defendant inserted in its articles of incorporation and in every certificate issued, both common and preferred, the following language: "All the preferred stock is and will be subject to the right of the company to redeem the same at par at any time after three years from the date of its issue." 260,000 shares of the par value of $100 per share were issued, of which 110,000 shares were common and 150,000 shares were preferred. The voting power was given to both kinds of stock. The preferred stock was also given the right to receive out of the net surplus profits a 4 per cent. noncumulative dividend whenever declared by the directors, payable in preference and priority to the payment of any dividends on the common stock. In case of the dissolution of the corporation, the preferred shareholders were to receive the par value of their stock out of the surplus funds of the corporation before payment should be made to the holders of common stock. The defendant's board of directors on April 1, 1910, resolved to retire the preferred stock on April 30th, at par value, plus accrued interest at 4 per cent. from December 31, 1909, and deposited $15,200,000 with J. P. Morgan & Co. of New York City, for that purpose. At the same time a resolution was adopted, calling a meeting of the stockholders for the purpose of increasing the common stock to the extent of $15,000,000. Formal notice of such retirement and intended new issue was duly given in New York papers. The proposed changes were also conspicuously noticed in a leading Columbus newspaper. This stock, if issued, is first to be offered to the common shareholders (the number of which is not shown) according to their holdings. A pronounced majority of the preferred stock certificates have been deposited with Morgan & Co. for retirement, and stock to the amount of more than $5,000,000 had been redeemed prior to the granting of the hereinafter mentioned restraining order prohibiting such retirement. The residue of the fund, amounting to about $10,000,000, awaits the court's action. Section 3264, Rev. St., of the general incorporation act (section 8700, Gen. Code), provides: "The board of directors of any such corporation may, with the written consent of the persons in whose names a majority of the shares of the capital stock thereof stands on the books of the company, reduce the amount of its capital stock and the nominal value of all shares thereof, and issue certificates therefor, but the rights of creditors shall not be affected or impaired thereby; and a certificate of such action shall be filed with the secretary of state."

The defendant's line extends from Toledo, Ohio, through the coal fields of South Central Ohio to the Ohio river. The road of the Toledo & Ohio Central Railway Company, a competing and parallel line, extending from Toledo to the same coal fields, connects at Corning with the Kanawha & Michigan Railway Company, with which it forms a continuous line extending into the coal fields of West Virginia and terminating at Gauley Bridge in that state. The Zanesville & Western Railway Company also enters the Ohio coal fields. The defendant as contemplated by the reorganization plan, acquired control through stockholdings not only of various coal companies and large areas of coal lands, but also of the Kanawha & Michigan Railway Company, and the Toledo & Ohio Central Railway Company. The last-named company in turn owned the stock of the Zanesville & Western Railway Company. The defendant thus dominated three other coal roads.

In 1903 the Trunk Line Syndicate was formed, consisting of the Chesapeake & Ohio Railway Company, a Virginia corporation, the Baltimore & Ohio Railroad Company, the Lake Shore & Michigan Southern Railroad Company (a controlled line of the New York Central & Hudson River Railway Company), the Pittsburg, Cincinnati, Chicago & St. Louis Railway Company (a controlled line of the Pennsylvania Company), and the Erie Railroad Company. The Chesapeake & Ohio Railway Company became the owner of 11,540 shares of the common stock of the defendant company. The other members of the syn-

dicate owned in the aggregate 57,702 shares of such stock. The syndicate company thus owned a majority of the defendant's common stock. Through an advisory committee they interfered in the management of the defendant's affairs. They did not, however, own any part of the defendant's preferred stock, which was held and owned by about 1,200 different persons. The roads comprising the Trunk Line Syndicate reach the coal fields of Southeastern Ohio, West Virginia, and the Pittsburg district. All of the hereinbefore named roads were interested and engaged in the transportation of coal from the coal fields reached by them respectively to the Upper Lakes and the Northwest. The defendant, in a quo warranto proceeding having been ousted from its stockholdings in coal companies and the railways controlled by it (12 Ohio Cir. Ct. R. [N. S.] 49, 145), proceeded to dispose of such holdings, and subsequent to such last annual election of directors the Chesapeake Company acquired the 57,702 shares of the defendant's common stock owned by the other members of the Trunk Line Syndicate. Certain of the directors of the defendant company resigned, whereupon as authorized by the rules and regulations of the company and by section 3248, Rev. St. (section 8662, Gen. Code), the remaining directors filled the vacancies so created for the unexpired term by appointment. The appointees were persons connected with the Chesapeake Company, who, it is asserted by the plaintiffs and denied by the defendant, were mere dummies, hostile to the interests of the Hocking Company, and will subject it to the domination of the Chesapeake Company. The Lake Shore & Michigan Southern Railway Company in the meantime acquired all of the stock of the Toledo & Ohio Central Railway Company and of the Zanesville & Western Railway Company, and a portion of that of the Kanawha & Michigan Railway Company, which connects with the Toledo & Ohio Central Railway Company at Corning, Ohio, and also touches the defendant company's line at different points in Ohio. Another portion of the stock of the Kanawha & Michigan Railway Company was purchased by the Chesapeake Company, and a third portion is owned by parties other than the Lake Shore & Michigan Southern Railway Company and the Chesapeake Company. These two last-named companies have made, or are about to make, an arrangement whereby they will each have representation on the directory of the Kanawha & Michigan Railway Company's road and each have the use of its tracks for transporting coal from West Virginia to the Northwest; the loaded trains proceeding northward from its northern connections over the defendant's road, and the empty trains returning southward over the Toledo & Ohio Central Railway Company's road to its connection with the Kanawha & Michigan, and thence over its tracks to points in West Virginia. The Chesapeake Company, through proceeds derived from the sale of its bonds, intends to buy a majority of defendant's new common stock issue.

The plaintiffs, who are stockholders in the defendant company, in behalf of themselves and all other stockholders, filed a petition against the defendant—the Chesapeake Company not being made a party—in the state court April 27, 1910. They charge that the defendant and its controlled roads and the Trunk Line Syndicate entered into an unlawful combination and conspiracy to stifle competition and restrain trade in the mining and shipping of coal from the coal fields of Ohio, West Virginia, and Pennsylvania to the Upper Lakes and the Northwest. Many specific acts of wrongdoing in the way of discrimination in rates against independent coal operators and against the rights of stockholders, and in violation of the state and federal laws, are alleged, which acts are claimed to work direct, actual, specific personal injury to the plaintiffs and the other stockholders. They allege that the purchase of the defendant's stock by the Chesapeake Company from the other members of the Trunk Line Syndicate and the sale by the defendant company of its stockholdings were a mere device to evade the decree of the state court; that the defendant and the roads formerly controlled by it, the Chesapeake Company, and the Lake Shore & Michigan Southern Railway Company, intend to perpetuate the course of wrongful conduct pursued while the Trunk Line Syndicate was in existence and the defendant company controlled the roads whose stock it owned; that the board of directors of the Hocking Company is not a legal board; that the proposed retirement of its preferred stock and the issuing of common stock is illegal; that such preferred stock can-

not be retired except by vote of the stockholders; that the funds of the defendant cannot be applied to the retirement of the preferred stock—such funds so deposited with J. P. Morgan & Co. consisting of the proceeds of the sale of its former stockholdings in other roads and coal companies and $2,500,-000 of borrowed money; that it cannot legally borrow money for the retirement of preferred stock; that the Chesapeake Company cannot lawfully acquire and hold stock in the defendant company; and that the Chesapeake Company, which has transported West Virginia coal to the Upper Lakes by carrying it to Cincinnati and Ironton, Ohio, and thence shipping it over the Cincinnati, Hamilton & Dayton Railway Company and the Detroit, Toledo & Ironton Railway Company, respectively, to Toledo and the Northwest, is a competitor of the defendant in the shipment of coal. All these things were denied by the defendant, and, after the Chesapeake Company was made a party, by it also. For the purposes of this opinion a more detailed statement of the petition is unnecessary.

On an ex parte hearing an order issued from the state court restraining the defendant, among other things, from retiring its preferred stock, from taking any action in that behalf, and from using or disbursing any of its assets or funds for that purpose; from increasing its common stock or taking any action in regard thereto in consequence of any direction, authority, or alleged action of its common stockholders, and from calling or holding any meeting of such common stockholders; from recognizing the Chesapeake Company as a stockholder and permitting it or any one acting in its behalf to vote any stock held by it directly or indirectly in the defendant company; from borrowing any money for the retirement of preferred stock; and from doing any of the threatened illegal and unlawful acts alleged in the petition. Thereafter the defendant moved to modify the restraining order so as to permit the retirement of its preferred stock to proceed and the use and disbursement of the funds held and deposited for that purpose, and also to permit the holding of meetings of its common stockholders. The motion to modify the restraining order was heard and submitted. Counsel are not agreed, and the record is not clear, as to whether a motion for a temporary injunction was submitted at the same time or not. On the morning of May 16th the court announced a denial of the motion to modify and granted a temporary injunction. Shortly thereafter a sufficient petition and bond for removal to this court were filed, and the court's attention was directed to that fact. A few minutes later the order for removal was submitted for its allowance. Thereafter, and before taking any other action, the court appointed receivers for the defendant company. Nearly three hours later, after the noon recess, the court approved an entry overruling the motion to modify the restraining order, granting an injunction, fixing the injunction bond, appointing receivers, and fixing their bond, which entry was journalized and such bonds given. The court also approved an entry declining "to make any order one way or the other" as to the removal of the cause to this court, for the reason that it had "no jurisdiction or power to decide the question involved by the petition for removal." The intervenor, Stanton, has for some years past owned 500 shares of the defendant's stock. The plaintiffs own in the aggregate 150 shares of the preferred stock, of which 125 shares were purchased shortly prior to the last October corporate election, and 25 shares shortly subsequent thereto. They also own 90 shares of the common stock, which were acquired after the redemption of the preferred stock had been ordered by the defendant's board of directors. Certified copies of the proceedings in the state court have been filed in this court. The case is submitted on the pleadings, affidavits, and records and documents offered as exhibits.

Cyrus Huling, Smith W. Bennett, and W. H. Jones, for plaintiffs.

Lawrence Maxwell, for Chesapeake & O. Ry. Co.

Wilson & West, James H. Hoyt, and Lawrence Maxwell, for defendant company.

Wade H. Ellis and Challen B. Ellis, for Stanton.

SATER, District Judge (after stating the facts as above). The petition and bond for removal to this court, which were filed and

brought to the state court's attention soon after it rendered its opinion refusing to modify the restraining order and granting a temporary injunction, are, and are conceded to be, sufficient in substance and form. An order for removal was presented to it for allowance; but, instead of allowing such order or determining the sufficiency of the petition and bond, the court proceeded to appoint receivers for the defendant, the Hocking Valley Railway Company. The entry overruling the motion to modify the restraining order, allowing a temporary injunction, fixing the amount of the injunction bond, appointing receivers, and fixing their bond, was not approved, filed, or journalized until nearly three hours later. The petition charges a. violation of the Sherman anti-trust act' (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), whereby certain direct, actual, and special injuries are inflicted on and threatened to the plaintiffs and intervener, independent of those caused to the general public, or to all alike, merely from the suppression of competition in trade and commerce among the states. This court, therefore, has jurisdiction. Bigelow v. Calumet & Hecla Min. Co. (C. C.) 155 Fed. 869, and 167 Fed. 721, 94 C. C. A. 13; Merz Capsule Co. v. U. S. Capsule Co. (C. C.) 67 Fed. 414; A. Booth & Co. v. Davis (C. C.) 127 Fed. 875, and 131 Fed. 31, 65 C. C. A. 269; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Robinson v. Suburban Brick Co., 127 Fed. 804, 62 C. C. A. 484; Leonard v. Abner-Drury Brewing Co., 25 App. D. C. 161; Chalmers Chemical Co. v. Chadeloid Chemical Co. (C. C.) 175 Fed. 995; Union Trust Co. v. Atchison, T. & S. F. R. Co. (C. C.) 64 Fed. 724; In re Debs, 158 U. S. 564, 600, 15 Sup. Ct. 900, 39 L. Ed. 1092.

It consequently follows that on the filing of the petition and bond, the case being removable, it was, by the terms of section 3, c. 866, Act Aug. 13, 1888, 25 Stat. 435 (U. S. Comp. St. 1901, p. 510), "the duty of the state court to accept said petition and bond and proceed no further in such suit." Its authority to take any further proceedings in the case, except to examine into the legal sufficiency of the removal papers, ceased, ipso facto (Black's Dillon on Removal of Causes, § 189; Railroad Co. v. Koontz, 104 U. S. 14, 26 L. Ed. 643; Foster's Fed. Pr. [4th Ed.] 1586, 1587), and that of this court attached (18 Ency. Pl. & Pr. 347; Marshall v. Holmes, 141 U. S. 594, 12 Sup. Ct. 62, 35 L. Ed. 870; Steamship Co. v. Tugman, 106 U. S. 122, 1 Sup. Ct. 58, 27 L. Ed. 87; Monroe v. Williamson [C. C.] 81 . ed. 977; Probst v. Cowen [C. C.] 91 Fed. 931; Foster's Fed. Pr. [4th Ed.] 1585, 1586). A formal order of removal is usual; but such order by the state court was not necessary to confer jurisdiction on this court, nor could it by declining to make such order prevent jurisdiction from attaching here. Kern v. Huidekoper, 103 U. S. 490, 26 L. Ed. 354; Hubbard v. Chicago, M. & St. P. Ry. Co. (C. C.) 176 Fed. 994; Railroad Co. v. Koontz. Its authority to proceed further in the case having ended, all subsequent action had therein, including the appointment of receivers and approval of entries, was coram non judice and absolutely void. Flint v. Coffin (C. C. A.) 176 Fed. 872, 874; Gordon v. Longest, 16 Pet. 97, 10 L. Ed. 900; Virginia v. Rives, 100 U. S. 313, 317, 25 L. Ed. 667; Railroad Co. v. Koontz.

The plaintiffs assert that the state court's announcement of the granting of a temporary injunction has, nevertheless, all the force and effect of a judgment, and cite State v. Meacham, 6 Ohio Cir. Ct. R. 31, and Black on Judgments, § 106. Their position is that a judgment, though not entered, is still a judgment, that the omission to enter it does not destroy it, and that its vitality does not remain in abeyance until it is recorded. The defendant company appeals to the Ohio statutes and asserts that the court's announcement of its conclusions does not rise to the dignity of a judgment and is wholly ineffective, and that it is entitled to a hearing in this court on its motion to modify the restraining order filed in the state court. The General Code classifies injunctions under "provisional remedies." It does not designate a temporary injunction as a judgment. A temporary injunction is a provisional remedy (section 11,875), a temporary order (section 11,876), and when granted is allowed as a temporary remedy (section 11,879). It is not a judgment. The judgment in an injunction suit is the final order rendered in the court in which the trial of the action is had. Sections 11,879, 11,875. This is in harmony with section 11,582, which declares that "a judgment is the final determination of the rights of the parties in action," and defines an order to be "a direction of a court or judge, made or rendered in writing and not included in a judgment." An order does not become effective until it is entered on the journal. It lacks finality, and hence the qualities or the consequences of a judgment. 23 Cyc. 667; Finnell v. Burt, 2 Handy, 202. Section 11,882 provides that:

"Unless otherwise provided by special statute, no injunction shall operate until the party obtaining it gives a bond executed by sufficient surety, to be approved by the clerk of the court granting the injunction, in an amount to be fixed by the court or judge allowing it, to secure to the party enjoined the damages he may sustain, if it be finally decided that the injunction ought not to have been granted."

As the bond was not executed until after the court had approved the entry fixing the amount, at which time it had lost jurisdiction of the case, the bond is void. The temporary injunction authorized by the court consequently never became operative or binding on the defendant. Section 11,885. The status of the state judge's orally expressed determination allowing the temporary injunction, as fixed by the state statute, accords with the federal rule. Judson v. Gage, 98 Fed. 540, 512, 39 C. C. A. 156. The views above expressed also find support in Coe v. Erb, 59 Ohio St. 259, 52 N. E. 640, 69 Am. St. Rep. 764.

The case, therefore, came into this court with the defendant's motion to modify the restraining order still standing. The much-discussed question of the right of this court, under the facts presented, to review the action of the state court, and the propriety of its so doing, does not arise. Section 4 of the Judiciary act (Act March 3, 1875, c. 137, 18 Stat. 471 [U. S. Comp. St. 1901, p. 511]), relating to the removal of causes, among other things, provides that:

"All injunctions, orders and other proceedings had in such suit prior to its removal shall remain in full force and effect until dissolved or modified by the court to which such suit shall be removed."

The power to modify or dissolve the order made by the state court is thus expressly conferred. The federal courts have always, after the removal of a case, exercised the right to hear and act on a motion filed in the state court to modify or vacate a restraining order or a temporary injunction. But two cases, decided, however, by distinguished and discriminating judges, will be cited in support of the rule, Board of Com'rs v. Peirce (C. C.) 90 Fed. 764, decided by Judge Taft, and Perry v. Sharpe (C. C.) 8 Fed. 15, decided by Mr. Justice Matthews sitting on the circuit in this district.

The plaintiffs deny that the power to redeem and cancel the preferred stock is conferred on the directors, and assert that the resolution for its retirement adopted by them is wholly ineffectual, and will not only constitute a purchase by the corporation of its own shares, but will also operate as a reduction of the capital stock, and that such reduction can be lawfully made only as provided by section 3264 of the general corporation act (section 8700, Gen. Code). That section requires the written consent of the persons in whose names a majority of the shares of the capital stock stands on the books of the company, and the filing of a certificate of such action with the Secretary of State. The defendant disputes the correctness of their position.

A permanent reduction of stock or diminution of assets is not purposed. The resolution which provides for the redemption of the preferred stock also calls for a meeting of the stockholders, as required by section 3308, Rev. St. (section 8816, Gen. Code), to vote upon an issue of common stock to take the place of that redeemed and canceled. In the reorganization of the Hocking Valley & Toledo Railway Company and the acquisition of its property by the defendant, in 1899, the preferred stock was issued by the defendant company to reduce fixed charges and to lift some of the indebtedness for which it was required to provide in taking over its predecessor's property. The railway act not only authorized the issue of preferred stock, but its mandate was that the defendant company "shall reserve the privilege of redeeming and canceling the same at par at any time after three years from the date of its issue." To avoid misapprehension on the part of any one subsequently dealing with the stock, not only was the right of redemption thus exacted reserved in the articles of incorporation, but into every certificate of stock, common and preferred, there was written:

"All the preferred stock is and will be subject to the right of the company to redeem the same at par at any time after three years from the date of its issue."

The statute, as did the defendant, contemplated that the preferred stock should be, or at least might be, of a temporary character. Its holders are in fact stockholders and not creditors (Miller v. Ratterman, 47 Ohio St. 141, 24 N. E. 496), and yet, as was said in the case of Weidenfeld v. Northern Pacific Ry. Co., 129 Fed. 305, 63 C. C. A. 537, the facts of which in many respects resemble those of this case, the preferred stock retains to some degree the quality of the original indebtedness which it succeeded. The issue of preferred shares by a

corporation, it is true, increases the capital stock; but it is also frequently the means, as every experienced lawyer knows, of raising money by pledge of the company's income. Morawetz, Corp. § 463. The holders of the defendant's preferred shares as against the holders of its common shares were given a preferential right in the payment of dividends, and, in case of the dissolution of the corporation, in the distribution of its assets. That the redemption of the preferred stock, whether common stock be substituted in its stead or not, would be advantageous to the holders of the common stock, is apparent. As against the advantages conferred on the holders of preferred stock, the right to redeem it was by unanimous consent reserved. It is unquestioned law that the defendant's charter constitutes a contract between the corporation and its stockholders. Cook, Corp. (4th Ed.) § 493. Stock in the railway company is held by contract between the corporation and its stockholders. Toledo Bank v. Bond, 1 Ohio St. 649. A certificate of stock is the muniment of the stockholder's title and evidence of his right, and in this case it also substantially expresses the contract between the corporation and his co-stockholders and himself. Kent v. Quicksilver Min. Co., 78 N. Y. 159, 180. The recitals in the articles of incorporation and the stock certificates, to borrow the language of Chancellor Kent, "are of the character and authority of permanent constitutional provisions, binding upon all the members, when adopted by all, as a solemn contract, and * * * they can only be abolished by the like concurrent will by which they were adopted." Livingston v. Lynch, 4 Johns. Ch. (N. Y.) 573, 595. The provision relating to the redemption of preferred stock inserted in the articles of incorporation and in the stock certificates was within the terms of the statute, and each stockholder, by his purchase and acceptance of stock, assented to such provision and became bound thereby as a part of a valid and enforceable contract between himself and the corporation. Hackett v. Northern Pac. Ry. Co., 36 Misc. Rep. 583, 73 N. Y. Supp. 1087; Weidenfeld v. Northern Pac. Ry. Co., 129 Fed. 305, 63 C. C. A. 537; Hackett v. Northern Pac. Ry. Co. (C. C.) 140 Fed. 717; Thompson on Corp. (2d Ed.) § 3600; Cook, Corp. (6th Ed.) pp. 742, 745, and Note; Hamlin v. Toledo, St. L. & K. C. R. Co., 78 Fed. 664, 672, 24 C. C. A. 271, 36 L. R. A. 826; Clark & Marshall on Corp., pp. 3476, 3480, 1311, 1312; Miller v. Ratterman, 47 Ohio St. 141, 24 N. E. 496.

In Coppin v. Greenlees, 38 Ohio St. 275, 43 Am. Rep. 425, it is said that the decided weight of authority, both in England and in the United States, is against the existence of the power of a corporation to buy and sell its own stock, unless such power is conferred by express grant. The foundation principle, upon which such cases rest, and which has been frequently and emphatically declared by the Supreme Court of Ohio, is that a corporation possesses no powers except such as are conferred upon it by its charter, either by express grant or necessary implication. Under the Ohio rule the law of the case is stated in the syllabus, and what was actually decided was:

"An executory agreement between a manufacturing corporation of this state and one of its stockholders, for the purchase of the stock of such cor-

poration, by the former from the latter, cannot be enforced either by action for specific performance or for damages."

The denial of the right to purchase its own stock was based on the absence of a grant of power so to do and the constitutional provision which imposed a double statutory liability on stockholders for the satisfaction of debts due corporate creditors. But in this case the grant of power exists, and the double statutory liability has been abrogated by constitutional amendment. I have been cited to no Ohio case, and I have found none, which announces, as an inflexible rule, that a corporation may not purchase its own stock, or that the mode prescribed by section 8700, Gen. Code, for the reduction of capital stock, is exclusive. In the Coppin Case it is said:

"If it were averred that the plaintiff had purchased this stock from the defendant, or from others, under an agreement with the company that it buy the same from him when he quit its employment, or if the contract of purchase by the defendant had been executed, very different questions would arise."

If the corporation could have purchased its stock by virtue of an agreement that it should buy the same whenever the stockholder chose to quit its employment, and such is apparently the inference to be drawn from the court's language, and such it was held in Fremont Carriage Co. v. Thomsen, 65 Neb. 370, 91 N. W. 376, a corporation may lawfully bind itself to do, it must follow that it could have purchased the stock if the contract had been that it should so do whenever it exercised the privilege of discharging him. The Coppin Case dealt with an executory contract. This is a case of executed contract of sale, but unexecuted as to the surrender of stock for redemption and cancellation at the stipulated price. The defendant has performed its part of the contract to the extent of tendering the agreed price for redemption. The plaintiff's refusal to perform rests on a denial of the regularity of the manner in which the redemption is ordered, although it is manifest that the redemption and cancellation ordered by the directors, and heretofore unanimously agreed upon, would receive the approval of a large majority of the shareholders were the question submitted to them for action or their reaffirmance of their contract necessary. In Morgan v. Lewis, 46 Ohio St. 1, 17 N. E. 558, the plaintiff sold certain real estate to the corporation and was paid in corporate stock. Subsequently, differences having arisen, an exchange back was made in settlement. The corporation had no debts, and no one was injured by the transaction. It was held:

"That no inflexible rule has been recognized by this court that a corporation may not in any case; nor for any purpose, receive its own stock. * * * It being the law of our state that there are exceptions to the general rule that corporations may not deal in their own stock, all persons dealing with this company must be held to have done so in the light of this state of the law."

The stock, it is true, was held not to be canceled; but it was nevertheless so far canceled that it was nonassessable for the benefit of creditors who enforced the double statutory liability when the corporation subsequently became insolvent. Other cases illustrating excep-

tions to the general rule are Taylor v. Miami Exporting Co., 6 Ohio, 176, State v. Franklin Bank, 10 Ohio, 92, 97, Cincinnati, etc., R. Co. v. Duckworth, 2 Ohio Cir. Ct. R. 518, Sanderson v. Ætna Iron Co., 34 Ohio St. 442. In all of the above-cited Ohio cases the stock purchases were made by the executive officers of the corporation, and not on a vote of the stockholders. In many of the states, in the absence of charter restrictions against the redemption or repurchase of its shares, where the provision therefor is not kept secret, shares may be issued subject to the stipulation that they may be bought back at the option of the corporation. Machen, Corp. §§ 640, 625; Cook, Corp. (4th Ed.) §§ 311, 312; note to Hall v. Henderson, 61 L. R. A. 621; In re Castle Braid Co. (D. C.) 145 Fed. 224; Burnes v. Burnes, 137 Fed. 781, 70 C. C. A. 357; U. S. Mineral Co. v. Driscoll, 106 Va. 663, 56 S. E. 561, 117 Am. St. Rep. 1028; 7 Am. & Eng. Ency. Law (2d Ed.) 818; Fremont Carriage Mfg. Co. v. Thomsen, 65 Neb. 370, 91 N. W. 376; Vent v. Duluth Coffee & Spice Co., 64 Minn. 307, 67 N. W. 70. And in such instances such power may be exercised by the board of directors. Lumber Co. v. Telephone Co., 127 Iowa, 350, 101 N. W. 742; Chicago, etc., R. R. v. Marseilles, 84 Ill. 643; First Nat. Bank v. Salem Capital Flour-Mills Co. (C. C.) 39 Fed. 89, 96.

This case, however, rests, not on an exception to a general rule, but on a specific legislative grant of power to redeem and cancel. "To redeem," it is said in Miller v. Ratterman, supra, "is to purchase back; to regain as mortgaged property by paying what is due; to receive back by paying the obligation." The word "redeem," as used in statutory provisions authorizing a party to redeem, means "repurchase." Robinson v. Cropsey (N. Y.) 2 Edw. Ch. 138, 146; Pace v. Bartles, 47 N. J. Eq. (2 Dick.) 170, 20 Atl. 352. Section 3380a, Rev. St. (section 9027, Gen. Code), which authorizes consolidating companies to "fix by the agreement for consolidation the terms and conditions upon which it is to be made, which terms and conditions may include the payment or retirement of the preferred stock of either or any of the constituent companies, if they have such," uses the words "payment" and "retirement" as equivalents. Every stockholder, therefore, at the time he acquired his stock and in advance of the earliest date at which it might be redeemed, agreed that the defendant might purchase it back, might regain it by paying the stipulated price therefor, just as it might repossess itself of mortgaged property which it had pledged to secure a debt. His agreement to sell his preferred stock is a continuing obligation whose performance the corporation, through its board of directors, can at the appropriate time enforce as fully as it can carry out, through the same board, an agreement to retire its corporate bonds at their maturity. The corporate powers, business, and property of the defendant company are exercised, conducted, and controlled by its board of directors. Section 3248, Rev. St. (section 8660, Gen. Code); Sims v. Street Ry. Co., 37 Ohio St. 565; Goodin v. Evans, 18 Ohio St. 167. The redemption of its preferred stock is a part of its corporate business. the transaction of which devolves on its directors. They cannot make organic or fundamental changes in the composition or business of the corporation (Railway Co.

183 F.—10

v. Allerton, 18 Wall. 233, 21 L. Ed. 902) ; but the retirement of preferred stock is not such a change, when unanimously agreed upon by the stockholders and authorized by statute, and the rights of creditors are not prejudiced thereby (Weidenfeld v. Northern Pac. Ry. Co.; Hackett v. Northern Pac. Ry. Co., 36 Misc. Rep. 583, 73 N. Y. Supp. 1087; Clark & Marshall on Corp. p. 3480; 2 Purdy's Beach on Private Corp. pp. 1284, 1285). If the directors may not redeem the stock, then, by reason of the superior voting power of the preferred shareholders, stock of a temporary character may remain outstanding during the life of the corporation.

Each shareholder in the purchase of his stock dealt with the corporation at arm's length as a distinct and artificial entity or person. In entering into its contractual relation with him, the corporation reserved to itself the option of redeeming or repurchasing his stock after a specified date. The preponderance of the voting power has always been with the preferred shareholders. They could at all times have named the board of directors and controlled the corporate policy. A large majority of them, by depositing their certificates of stock for redemption, have expressed their willingness to abide by the contract. None of the petitioners, as a party to an option contract freely made, may decide that the corporation, the other party thereto, through its duly chosen business representatives, in so long as it acts within the terms of such contract, shall not exercise the option reserved therein to buy back the property sold. Watts v. Kellar, 56 Fed. 1, 5 C. C. A. 394; Johnston v. Trippe (C. C.) 33 Fed. 530; Hackett v. Northern Pac. Ry. Co., 36 Misc. Rep. 583, 73 N. Y. Supp. 1087. A statute should not be so construed as to sanction the repudiation of a legally authorized contract by one of the parties thereto, or as to require so useless a thing as his ratification of it, or as to permit him to deprive the other party from exercising his reserved right to enforce one of its provisions at a time which by its very terms such other party may himself designate. Section 3264 undoubtedly applies where there is no legally authorized contractual relation between the corporation and its several stockholders as to the redemption of stock, such as is here shown to exist. By limiting its application to cases of that character, inconsistency between it and the sections which authorize the issuing of preferred shares, and direct that the right of buying them back after a specified date shall be reserved, is obviated.

The controversy in this case is wholly between the corporation and four of its stockholders. No creditor is complaining, and no one can complain, because the recitals in the articles of incorporation were notice to him of the reserved right to redeem. Future creditors cannot complain, because they will be held to have given credit upon the amount of the stock then outstanding. They cannot even claim that the repurchase was irregularly made. Cook, Corp. (4th Ed.) § 289. Even prior to the abrogation of the constitutional provision imposing a double statutory liability on stockholders for the payment of corporate debts, the requirement of section 3264, Rev. St. (section 8700, Gen. Code), that a certificate of the reduction of capital stock shall be filed with the Secretary of State, accomplished little more than the maintenance of a record in his office of the authorized capital at any

given time. Actual and prospective creditors could not safely rely on such record as indicative of the amount of stock subject to the double liability, because such record did not disclose the amount of stock subscribed. Section 251, Rev. St., however, exacted that the defendant should file with the Commissioner of Railroads an annual report specifically stating the amount of capital stock subscribed and paid for. That section has been supplanted by section 605 of the General Code, which provides that the statement submitted shall be similar in character and detail to the annual report required to be made to the Interstate Commerce Commission. The report in use requires a statement of the number of shares authorized, outstanding, in the treasury, and issued within the year. Section 2780—24, Rev. St. (now sections 5522, 5523, 5524, Gen. Code), the excise or franchise tax law, requires every corporation for profit to report annually to the secretary of state, among other things, the amount of its capital stock as authorized, subscribed for, issued, outstanding, and paid up, and the change or changes, if any, in any of these respects subsequent to the filing of the preceding annual report. Aside from the fact that it is somewhat difficult to see how the defendant can report to the Secretary of State the increase of common stock without disclosing the redemption of its preferred shares, its next annual report to the Railway Commission and to the Secretary of State must show the retirement of such preferred shares and the issue of common stock in their stead. The abolishment of the double statutory liability has remitted creditors to the actual corporate assets as a basis of credit and for the payment of claims due them; but they will still have the same means of knowledge as heretofore as to such assets and authorized, subscribed for, and paid-up capital stock. The petitioners and intervener cannot complain of want of publicity as to any of these matters, because they have knowledge of them and have assented to the reduction.

As justifying a conclusion different from that above announced, plaintiffs' counsel cite Eidman v. Bowman, 58 Ill. 444, 11 Am. Rep. 90; McNulta v. Bank, 164 Ill. 427, 45 N. E. 954, 56 Am. St. Rep. 203; Leather Co. v. Kurtz, 34 Mich. 89; Railway Co. v. Allerton, 18 Wall. 233, 21 L. Ed. 902; and perhaps other cases. Their facts readily distinguish them from the case at bar.

The restraining order was granted on the theory that, as in Ohio one railroad corporation cannot purchase and own the stock of a competing company, the defendant's board of directors is illegally constituted because about 70,000 shares of its common stock, now held by the Chesapeake & Ohio Railway Company, were illegally voted at the last annual election of directors, and that, when resignations occurred in the board, the vacancies were filled by persons interested in and friendly to that road, whereby it was given the domination and control of the defendant. In the absence of a showing of the vote cast, the presumption is that the directors owed their election to all of the stockholders, representing all of the stock, and that the stockholders aimed to benefit the corporation and acted as their interests prompted. Memphis & Charleston R. Co. v. Woods, 88 Ala. 642, 645, 7 South. 108, 7 L. R. A. 605, 16 Am. St. Rep. 81. At the last election only

about 27 per cent. of the defendant's stock was owned by railroad companies. They owned none of the 150,000 shares of preferred stock, nor is it claimed that they in any manner sought to control the conduct or vote of any of the 1,200 persons who held such shares. As vacancies occurred in the board, they were filled in the manner prescribed by statute and the corporate regulations. As the Chesapeake Company is not a party to this suit, the court may not now adjudge its stockholdings in the defendant unlawful, or the defendant's board of directors illegally constituted. In Taylor & Co. v. Southern Pac. Ry. Co., 122 Fed. 147, Judge (now Mr. Justice) Lurton, said:

"It must be accepted as altogether fundamental that no court can adjudicate upon the rights, or interests, of one who is neither actually nor constructively before the court. The principle of due process of law unconditionally compels observance of the rule which limits the just jurisdiction of every court to a determination only of the rights of persons who are parties to the litigation. N. O. Waterworks v. N. O., 164 U. S. 471, 480 [17 Sup. Ct. 161, 41 L. Ed. 518]. In Mallow v. Hinde, 12 Wheat. 193, 198 [6 L. Ed. 599], where the court found itself unable to proceed for the want of an indispensable party, it was said: 'We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever be their structure, as to jurisdiction. We put it on the ground that no court can adjudicate directly upon a person's right without the party being actually or constructively before the court.' This doctrine has over and over again been announced by the Supreme Court, and in no case more emphatically than in Minnesota v. Northern Securities Co., 184 U S. 199, 237 [22 Sup. Ct. 308, 46 L. Ed. 499]."

Other authorities to the same point are Weidenfeld v. Northern Pac. Ry. Co., supra; Arkansas Valley Sugar B. & Irr. L. Co. v. Ft. Lyon Canal Co., 173 Fed. 601, 604, 97 C. C. A. 551; Williams v. Bankhead, 19 Wall. 563, 22 L. Ed. 184; Board v. Walbridge, 38 Wis. 179, 188; Kinkead's Code Pl. p. 12, § 14; Fergus v. City of Columbus, 6 Ohio N. P. 82; Osterhoudt v. Supervisors, 98 N. Y. 239; Bates, Pl., Pr. & Forms, 1791; Whittaker's Anno. Code (6th Ed.) 102; Stone v. Viele, 38 Ohio St. 314, 318; Daum v. Kehnast, 18 Ohio Cir. Ct. R. 4; Fertel v. Sampliner, 18 Ohio Cir. Ct. R. 744; Executors v. Young, 72 Ohio St. 510, 76 N. E. 1132. The restraining order, except in so far as it prohibits the defendant from holding a stockholders' meeting to consider and vote upon the issue of additional stock and the sale and disposition of the same, is vacated. The point excepted is held for further consideration.

On Motion for Temporary Injunction and Further Hearing to Vacate Restraining Order.

The complainants have filed an amended bill, making the Chesapeake & Ohio Railway Company (hereinafter called the Chesapeake Company) a defendant. Additional affidavits and exhibits have been offered in evidence, and the complainants now ask for a temporary injunction. The Chesapeake Company and the Hocking Valley Railway Company (hereinafter called the Hocking Company) resist the application, and the latter asks for the vacation of the restraining order in so far as it yet remains in force.

The Chesapeake Company is by its charter authorized to purchase, own, and hold shares of capital stock of any corporation or corpora-

tions organized under the laws of the state of Virginia, in which such company is incorporated, or of any other state, for the construction or operation of any railroad or railroads or other means of transportation. For some years past it has owned 11,540 shares of common stock of the Hocking Company. In March last it paid for and became the owner of 57,702 additional shares, whereby its holdings became a majority of the 110,000 shares outstanding.

Was the Chesapeake Company, under the circumstances of the case, lawfully authorized to purchase, and may it lawfully hold, stock in the Hocking Company, is the principal point in controversy, about which all others cluster. The complainants maintain the negative, and the companies the affirmative, of that question. Its answer involves a construction of Ohio statutes. Although the question has been fully argued, the court approaches it with reluctance, because there has been no opinion touching it rendered by the state's highest court.

When a corporation asserts that it is clothed with a given power and the right to exercise it, the burden is on it to show whence such power and right are derived. State v. Vanderbilt, 37 Ohio St. 591. The burden, therefore, of showing the existence of the power and right of the Chesapeake Company to acquire and hold stock in the Hocking Company is on such companies. If, under given circumstances, an Ohio railroad corporation may acquire and hold stock in another, then it is conceded that a foreign corporation of the same character may, under the same circumstances, do likewise. When, if at all, may one railroad corporation, chartered in Ohio, purchase and hold stock in another like Ohio corporation? A review of legislation and of the state of decision in Ohio as regards the right of one corporation to acquire stockholdings in another will be helpful.

The act of March 29, 1867 (64 Ohio Laws, p. 85; sections 10,172, 10,173, Gen. Code), provides that should an incorporated elevator company erect or own an elevator building and use it for the purpose of receiving or delivering grain from or to any railroad company, as freight carried or to be carried over its road, or any part thereof, the railroad company may subscribe for or purchase not more than one-third of its entire capital stock.

On April 3, 1868 (65 Ohio Laws, p. 55; sections 9313, 9315, Gen. Code), it was enacted that any railroad company, or any other private corporation, organized under the laws of the state, may subscribe for or purchase the stock of a bridge company to an amount not exceeding one-third of the whole thereof, if such bridge company by the laying of tracks has prepared the bridge for railroad uses.

Each of the two above-mentioned acts fixes the limit of stockholding of the purchasing company at less than a controlling interest.

The act of April 3, 1868 (65 Ohio Laws, p. 63; sections 9160, 9163, Gen. Code), provides that railroad companies may own stock in union depot companies and in a union railroad connecting the companies using the depot.

Under the act of April 13, 1874 (71 Ohio Laws, p. 69; sections 10,137, 10,138, Gen. Code), certain mining and manufacturing corporations may purchase or subscribe for such an amount of stock of any railroad or other transportation company as its directors may deem

necessary in order to procure proper facilities for transportation for the factories, mines, or other works of the companies, if the holders of two-thirds of the capital stock consent to such subscription or purchase. Under the provisions of this somewhat comprehensive act, the directors, having first obtained the requisite consent of the purchasing company's stockholders, may, in the exercise of a sound discretion, determine what amount of stock it is necessary to subscribe for or purchase, whether that amount be a controlling or a less interest.

The act of April 12, 1877 (74 Ohio Laws, p. 84; sections 10,170, 10,171, Gen. Code), which provides that any company incorporated, and organized under the laws of the state may, by the vote of a majority in interest of its stockholders, subscribe for or become the owner of stock in an incorporated common carrier company, imposes no limitation on the amount of stock that any corporation may purchase in a company of the character named, and no restriction as to the kind of corporation that may make such purchase.

. Section 3300, Rev. St. (sections 8806, 8807, 8809, Gen. Code), originally enacted in 1852 (50 Ohio Laws, p. 274), but frequently amended, provides that any railroad company, "may aid another in the construction of its road by means of a subscription to the capital stock of such company, or otherwise, for the purpose of forming a connection of the roads of the companies, when the road of the company so aided does not, and will not when constructed, form a competing line." By another provision of the same act (section 8809, Gen. Code), such aid shall not be furnished unless the holders of at least two-thirds of the capital stock of each company first assent thereto.

A railroad company may, therefore, under the conditions named, subscribe for and acquire stock in another under the power conferred by section 8806, on the following conditions only: (1) To aid such other company in the construction of its road; (2) for the purpose of forming a connection of the roads of the two companies; (3) the road whose stock is purchased must not form, when constructed, a competing line as against that of the purchasing company. By the terms of this section, no road or line may be termed "competing" until it is constructed. Competition as between railroads necessarily relates to transportation, and, in respect to transportation, the term "competing" signifies a road complete and ready for operation. 8 Cyc. 405; Penn. Co. v. Commonwealth (Pa.) 7 Atl. 368. The section does not confer the power on a railroad company to purchase stock in another, if the road or line of the other is completed. Its purpose is to foster competition, to encourage the development of the state and its industries, and to accommodate and supply the wants of the public by permitting one road to aid in the construction of another extending into communities destitute of or having limited railroad facilities. It contemplates that shippers and the traveling public along the lines of the purchasing road and the road which is about to be constructed or is in process of construction, or who, wherever dwelling, may have occasion to use such roads, shall be afforded transportation facilities back and forth without the purchasing company being subjected possibly to the entire burden of constructing a new line of its own into the territory which will be accommodated by the aided road.

The only other corporations, in so far as I have been able to discover, which were, prior to 1902, expressly authorized by statute to invest in the stock of other companies, are safe deposit and trust companies (Act May 4, 1894; 91 Ohio Laws, p. 201; sections 9810, 9811, Gen. Code), and incorporated religious, scientific, and beneficial associations not having a capital stock, but desirous of securing a lodge room, chapel, or regular place of meeting (Act April 18, 1883; 80 Ohio Laws, p. 177; section 10,196, Gen. Code).

Of the first six acts above mentioned, three authorize railroad corporations alone to acquire stock in another corporation, two confer the power on railroad and other private corporations alike, and one vests the power in given corporations to purchase and subscribe for stock of a railroad company. All of such acts contemplate increased transportation facilities. This, too, is the object of the provisions of section 8807, Gen. Code, which authorize one railroad company to acquire the control of another by leasing or purchasing any part of such railroad constructed or in the course of construction, if the two roads are continuous or connected and not competing, and of the act of March 30, 1877 (74 Ohio Laws, p. 71; section 9025, Gen. Code, and succeeding sections), which permit a consolidation of railroad companies into a single company, if their lines or any portion of them have been or are so constructed as to admit the passage of burthen or passenger cars over any two or more of such roads continuously without any break or interruption, and which also authorize consolidated roads in turn to consolidate with each other. As regards stockholding by one corporation in another, railroad companies have been favored corporations.

Such was the condition of legislation on May 6, 1902, when section 3256, Rev. St., was amended (95 Ohio Laws, p. 390; section 8683, Gen. Code) by adding thereto the following:

"A private corporation may purchase, or otherwise acquire, and hold, shares of stock in other kindred but not competing corporations, whether domestic or foreign, but this shall not authorize the formation of any trust or combination for the purpose of restricting trade or competition."

Original section 3256 specifically conferred the power on private corporations to borrow money, fixed the limitation on the amount to be borrowed and the rate of interest to be paid, and authorized the execution of a mortgage to secure the payment of both principal and interest. It did not control the conduct of railroad corporations in the borrowing of money, because their power to borrow was found in the succeeding chapter. The amendatory provision relates wholly to the purchase by one private corporation of the stock of another. The codifying commission, recognizing the want of connection between the powers conferred by the first and last portions of the section, placed the portion which constituted the original section under the subdivision of chapter 1, div. 1, tit. 2, relating to private corporations, entitled "Borrowing Money," and designated it in the General Code as section 8705. It located the portion added by the amendment in the subdivision of chapter 1, entitled "Capital Stock," and gave it the sectional number 8603 in the General Code. The Legislature, by its adoption of the General Code in February, 1910, approved the ac-

tion of the commission. The mere fact that the power of one private corporation to buy stock in another was tacked to the section of the general corporation act, which authorized private corporations other than railway companies to borrow money, did not, in and of itself, limit the new power to such other corporations.

By the express provisions of the amendment, one private corporation may buy stock in another under the following conditions only: (1) The corporations must be kindred; (2) they must not be competing; (3) the result of the purchase must not be the formation of a trust or combination to restrict trade or competition. At the time of the passage of the amendatory act of 1902, there was an increased demand for larger units of organization in the transportation, industrial, and business world. It was an era of consolidation and combination of business enterprises, of a pronounced policy of expansion. Reduction in the cost of production or the transaction of business was thought to lie in the centralization of capital and the conduct of business on a large scale. Enlarged enterprises were established by the purchase of others, or by their consolidation into a single company, or, when permitted by law, by the purchase by some one of the stock of another. In fact, one of the favorite methods, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. U. S. v. Northern Securities Co. (C. C.) 120 Fed. 721, 725. The then existing and prior tendency as regards railway companies is forcibly set forth in Cook on Corp. (6th Ed.) §§ 892, 314. While it has been the declared policy of the state to prohibit railroads from purchasing or controlling competitive or rival lines, it has also been its declared policy to encourage the formation of trunk lines and their buying, building, and operating branch or feeding lines. The Supreme Court of Georgia, in speaking of consolidations and the acquisition of such branch or feeding lines (State v. Central Ga. Ry. Co., 109 Ga. 716, 35 S. E. 37, 48 L. R. A. 351), said:

"The general effect of these consolidations and connections has really been to increase competition, has added greatly to the public convenience, and furnished greater and more commodious facilities for traveling; has operated to reduce the cost of transportation; has brought remote parts of the country into close proximity, as it were, to each other; has developed resources that would otherwise have remained dormant, by opening up the markets of the world to the products of the land; and has generally contributed to work to the welfare and prosperity of the people."

The Legislature of Ohio in 1902, while it enacted new and amended existing laws taxing private corporations and erected barriers against the formation of unlawful combinations, inaugurated a new policy enlarging greatly their powers and relieving them from some of the more onerous provisions found in the statutes and the Constitution. It so amended section 3258 as to limit the bringing of actions upon the liability of stockholders to 18 months after any debt or obligation shall become enforceable against them. It caused an amendment to the Constitution to be submitted for adoption by the electors, abolishing the double statutory liability of stockholders. The proposed amendment became a part of the Constitution. It extended the privilege of issuing preferred stock with a right of redemption to such

corporations as had not previously had it, and so amended section 3256 as to confer, within the limitations imposed, a power not previously conferred by statute on private corporations, of purchasing each other's stock. All of this legislation was in line with that of various other states.

At the time section 3256 was amended, section 3269, found in the chapter on General Corporation Law, and preceding the chapter on Railroads, recited that:

"The provisions of this chapter do not apply when special provision is made in the subsequent chapters of this title, but the special provision shall govern unless it clearly appear that the provisions are cumulative."

The complainants claim that this section, which is still in force, forbids the application of the provisions of the amendment to section 3256 to railroad corporations. The contention cannot successfully rest on the ground that a railroad corporation is not a private corporation, because it is recognized as such both by the statute and the Supreme Court. See title 9 of the General Code and its subdivisions, and section 9315. In Toledo Bank v. Bond, 1 Ohio St. 623, 643, it was said:

"Private institutions are those which are created or established by private individuals for their own private purposes. Public institutions are those which are created and exist by law or public authority. Some public benefits or rights may result from the institutions of private individuals or associations. So also some private or individual rights may arise from public institutions. The only sensible distinction between public and private institutions is to be found in the authority by which, and the purpose for which, they are created and exist. Because, therefore, a corporation may fall under the denomination of private corporations, in the artificial distinction between public and private corporations, it is none the less a public or political institution. The distinction between public and private corporations is somewhat arbitrary, and by no means determines whether the corporation is a public or private institution. If the stock in a banking, railroad, or insurance corporation be exclusively owned by the government, the institution is denominated a 'public corporation'; but if a private individual be allowed to own a single share of the stock, in common with the government, it is said that it becomes a 'private corporation.'"

Railroad companies are private corporations, but not in the strict sense of the ordinary business corporation, because they are charged with duties of a public nature which distinguish them from the purely and strictly private corporation; but in many respects they are private corporations in all that the term implies. They cannot be treated as public corporations, such as cities, counties, townships, and other like governmental subdivisions. Their foundation is private. They are organized for gain, and their strictly private rights are as much beyond legislative control as are the rights of the purely private corporation. 7 Am. & Eng. Ency. Law, 637, 638; Elliott on Railroads, § 2; Cook on Corp. § 891; Morawetz on Private Corp. § 3; Hale v. County Com'rs, 137 Mass. 111, 114; Dartmouth College v. Woodward, 4 Wheat. 518, 636, 668, 669, 4 L. Ed. 629; Rundle v. D. & R. Canal, 21 Fed. Cas. 11.

The contention is that the provisions of the amendment to section 3256 and of section 3300, now sections 8806, 8807, and 8809, Gen. Code, relating to stock purchases and holdings, are not clearly cumulative, and that therefore the amendatory act, not meeting the require-

ments of section 3269, now section 8733, Gen. Code, conferred no additional power on railroad companies, and the special provisions in the chapter on Railroads govern. The word "clearly," according to Webster's definition of it, means, "in a clear manner; without obscurity; without entanglement or confusion; without uncertainty." "Cumulative," as defined by the legal lexicographers, means "additional; that which is superadded to another thing of the same character and not substituted for it." Abbott's, Black's, and Anderson's Law Dictionaries. The amendment to section 3256 is applicable to railroad corporations, if it appears in a clear manner and without uncertainty that the power given by such amendment is additional and superadded to, is not substituted for, and was of the same nature as that conferred by section 3300.

Section 3256, like section 3300, authorized stockholding in one corporation by another, when the effect thereof was to increase, or at least was not to diminish, competition. Each granted a power of the same kind—the power to purchase stock. Each prohibited a corporation from holding stock in another, if the purpose or effect of such holding was to restrict trade or competition. The stockholding in each case must be in a kindred corporation. Under each the purchasing corporation may hold and vote a majority of the stock of another, select the directory of such other, and, consequently, through such directory, manage such other corporation's business affairs. Each recognizes that all this may be done without in any wise restricting trade or competition, or constituting a trust or unlawful combination. There are, however, marked differences as between the two sections. Under the first, one corporation may, within the limitations imposed, purchase the stock of another in an operating company. It may purchase for the purposes of investment, or lawfully to acquire a controlling interest. The power is general and does not require the assent of stockholders for its exercise. Under it stock may be bought in the open market as well as by subscription, and without reference to aiding the corporation whose stock is purchased. Section 3300 was designed to meet the specific condition therein named. Under it one railroad company may, only with the consent of two-thirds of its stockholders, acquire stock in a connecting uncompleted road only, by subscription only, and not in the open market, for the purpose of aiding the latter. If a controlling interest be acquired, such control is incidental to the main purpose of furnishing aid. The subject-matter and purposes of the amendment to section 3256 were original and novel, and the power conferred by it is a different and broader power than that given by section 3300. The amendment conferred a new power and did not repeal or negative, expressly or impliedly, any provision found in any section of any subsequent chapter on corporations. It contains no proviso or exception, is not a substitute for, the equivalent of, or in conflict with, any prior legislative enactment. Its language is unambiguous. Given its ordinary and familiar signification, it embraces all private corporations. It contains no suggestion of discrimination against any class or classes of corporations, and no hint that the friendly policy theretofore manifested toward railroad corporations to secure increased transportation facilities was reversed, or

that in such facilities the acme had been attained.   It is said that the previously expressed policy of the state had been to disable railroad corporations from holding stock in any but connecting aided roads, but, if that be so, it is also true that, with but few exceptions, all Ohio corporations, in so far as express legislative enactment is concerned, were disabled from holding and owning the stock of others.   The history of the country and of the law, and the public and business necessities then felt, point with no uncertainty to the conclusion that it was the purpose on the part of the lawmakers in the use of the language employed, and that the precise language of the act means, that all private corporations should enjoy the new power conferred.   That the act did not repeal any prior statutes upon the same subject-matter, embraces cases not covered by former legislation, and is not inconsistent with any law theretofore enacted, makes it a cumulative act within the definition given by Endlich on Statutory Interpretation, § 218.

In the construction of statutes the intent of the lawmakers must be found in the statutes themselves.   The first resort in all cases is to the natural, ordinary, familiar signification of the words employed.   The presumption is that language has been employed with sufficient precision to disclose the intent, and, unless an examination overthrows the presumption, nothing remains but to enforce the statute as written. If a law is plain and unambiguous, there is no room for construction, and it must be held that the lawmaking body meant what it plainly expressed, whether the expression be in general or limited terms.   All of the provisions of the statute touching upon the subject-matter under consideration are to be examined, and in the comparison of sections it is not to be supposed that any words have been needlessly employed.   Effect should be given, if possible, to the entire statute and to every section and clause, and one part should not be allowed to defeat another, if by any reasonable construction the two can stand together.   Moreover, in construing statutes the courts should not close their eyes to what they know of the history of the country and of the law, of the condition of the law at a particular time, of the public necessities felt, and other kindred things, for the reason that regard must be had to the words in which the statute is expressed as applied to the facts existing at the time of its enactment.   Cooley's Const. Lim. (6th Ed.) 69–74; 24 Am. & Eng. Ency. Law, 597, 605, 611, 616, 618;  State v. Vanderbilt, 37 Ohio St. 643;  In re Hathaway's Will, 4 Ohio St. 385;  State v. Schlatterbeck, 39 Ohio St. 268, 271.

Having regard to the canons of construction, the powers conferred by sections 3256 (as amended in 1902) and 3300, are consistent, may be exercised by the same corporation, and are clearly cumulative. The Chesapeake Company was authorized to acquire and may hold the stock of the Hocking Company, providing the latter is noncompeting and the result and purpose are not the formation of a trust or combination to restrict trade or competition.

Section 3256 was not construed in State v. Railway Co., 12 Ohio Cir. Ct. R. (N. S.) 49, 59, nor was a construction of it necessary in that case.   The court assumed that it applied to railroad corporations. The complainants further contend that the Chesapeake Company

cannot lawfully acquire and hold stock in an Ohio corporation, because section 148d, Rev. St. (section 178, Gen. Code), does not permit the issuance of a certificate by the Secretary of State to a foreign corporation to do business in this state, unless the business of such corporation to be carried on is such as can be lawfully carried on by a corporation incorporated under the laws of this state for such or a similar business, and because the purchase and holding of stock by one corporation in another, it is claimed, is in violation of the public policy of the state. The mere ownership of stock by a foreign corporation in a domestic corporation, even if it be a controlling interest, does not constitute the transaction of business. Peterson v. Chicago, R. I. & P. Ry. Co., 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841. It has been held that, without legal sanction, one corporation cannot subscribe for stock in another. Railway Co. v. Iron Co., 46 Ohio St. 44, 18 N. E. 486, decided in 1888. In Franklin Bank v. Commercial Bank, 36 Ohio St. 350, 354, 355, 38 Am. Rep. 594, decided in 1881, it was said that one corporation cannot become the owner of any portion of the capital stock of another corporation unless authority to become such is clearly conferred by statute. That point, however, was not before the court for decision, and the case has never been cited by the Supreme Court. Only Ohio corporations were involved in those cases. In the Franklin Bank Case, the right to deal in shares of stock in other corporations was not found in the powers enumerated in the act under whose provisions the bank was organized; but, on the contrary, the power, in language of undoubted import, was denied and its exercise expressly prohibited.

The announcements made in the above cases are subject to the exception that to compromise a doubtful debt, or, if necessary, to save itself from loss, a corporation may become the owner of the stock of another, with a view to its subsequent sale and conversion into money. First Nat. Bank v. Nat. Exchange Bank, 92 U. S. 122, 128, 23 L. Ed. 679; Armstrong v. Brewing Co., 26 Wkly. Law Bul. 39, 40; Coppin v. Greenlees, 38 Ohio St. 275, 43 Am. Rep. 425; Lamprect v. Kehrwicher, 40 Ohio St. 646. And from language employed in Coppin v. Greenlees, 38 Ohio St. 275, 43 Am. Rep. 425, and Morgan v. Lewis, 46 Ohio St. 1, 17 N. E. 558, it seems that still other exceptions are recognized. No case has been found in which there has been a ruling that a foreign corporation may not own stock in one incorporated within the state. The complainants contend, however, that this is immaterial. Railway Co. v. Iron Co., and the Franklin Bank Case were invoked in Hafer v. Railroad Co., 14 Wkly. Law Bul. 68, 70; but in that case the foreign corporation did not own the stock of the Ohio company, although it dictated how the stock should be voted. In Smith v. Railroad Co., 8 Ohio Cir. Ct. R. 583, 591, it appears that the Baltimore & Ohio R. R. Co. owned stock in the insolvent defendant company and defended against the double statutory liability on the ground that it could not legally hold the stock and that what it did or attempted to do was ultra vires and void. As to this contention the court said:

"In Railroad Co. v. Iron Co., 46 Ohio St. 44 [18 N. E. 486], it is held by the Supreme Court that: 'An incorporated company cannot, unless authorized by

statute, subscribe to the capital stock of another; a subscription so made is ultra vires and void.' Reading this proposition of the syllabus in connection with the quotation from Morawetz, p. 49, cited in support of it, and we think it is clear that the Supreme Court only intended to hold that a corporation cannot be an original subscriber or one of the incorporators of another corporation. If the Baltimore & Ohio Company cannot hold this 'Drexel, Morgan & Co.' stock, neither could it hold any of the common or preferred stock, which it is admitted it did own. Certainly a railroad company, without express authority in its charter, may invest its idle money in the dividend-paying stock of another corporation, and if it may do that, and enjoy the benefit of the dividends while paid, may it not be liable to assessment, the same as an individual, if from any cause the corporation becomes insolvent? We think the Baltimore & Ohio Company are liable to assessment on this stock as owners."

On review of the case in the Supreme Court the Baltimore & Ohio Company claimed that it was incapacitated to hold stock in the insolvent corporation, and was therefore not subject to assessment for the payment of its debts. On the other side it was asserted that that claim had been decided adversely to the Baltimore & Ohio Company when the case was previously before the circuit and Supreme Courts. 48 Ohio St. 219, 31 N. E. 743. The court held that the question was involved in the earlier hearing and had there been determined against the company. The language of the circuit court, however, regarding the investment of idle funds, went further, I think, than the circumstances of the case required.

Foreign corporations can exercise none of their franchises or powers within this state except by comity or legislative consent (Western Union Telegraph Co. v. Mayer, 28 Ohio St. 521; State v. Life Ins. Co., 47 Ohio St. 179, 24 N. E. 392, 8 L. R. A. 129), and may be ousted by proceedings in quo warranto, if in doing their business here they exercise franchises in contravention of local law (State v. Life Ins. Co., supra; State v. Ins. Co., 49 Ohio St. 440, 31 N. E. 658, 16 L. R. A. 611, 34 Am. St. Rep. 573). If the rule announced in the Smith Case and the construction hereinbefore placed on section 3256 are both unsound, the Chesapeake Company's right to purchase stock in the Hocking Company, if it exists, rests on the rule of comity. In Cowell v. Springs Co., 100 U. S. 55, 59, 25 L. Ed. 547, it was argued that, if a domestic corporation could not be created with given powers for reasons of public policy, a foreign corporation could not for like reasons be permitted to exercise such powers in the state or territory. Mr. Justice Field, holding against that contention, said:

"The answer to this position is found in the general comity which, in the absence of positive direction to the contrary, obtains through the states and territories of the United States, by which corporations created in one state or territory are permitted to carry on any lawful business in another state or territory, and to acquire, hold, and transfer property there equally as individuals. If the policy of the state or territory does not permit the business of the foreign corporation in its limits or allow a corporation to acquire or hold real property, it must be expressed in some affirmative way. It cannot be inferred from the fact that its Legislature has made no provision for the formation of similar corporations or allows corporations to be formed only by general law. Telegraph companies did business in several states before their Legislatures had created or authorized the creation of similar corporations; and numerous corporations existing by special charter in one state are now engaged, without question, in business in states where the creation of corporations by special enactment is forbidden."

Mr. Justice Harlan held, in Christian Union v. Yount, 101 U. S. 352, 356, 25 L. Ed. 888, that:

"In harmony with the general law of comity obtaining among the states composing the Union, the presumption should be indulged that a corporation of one state, not forbidden by the law of its being, may exercise within any other state the general powers conferred by its own charter, unless it is prohibited from so doing, either in the direct enactments of the latter state, or by its public policy to be deduced from the general course of legislation, or from the settled adjudications of its highest court. There was here no such direct legislation during or prior to the year 1870, nor can the existence of such a public policy be inferred from the general course of legislation or · judicial decisions in Illinois up to and including that year, in relation to religious, benevolent, charitable, or missionary societies created in other states."

The rule in Ohio is in accord with that announced in the above cases. State v. Ætna Life Ins. Co., 69 Ohio St. 327, 69 N. E. 608; Ewing v. Bank, 43 Ohio St. 31, 37, 1 N. E. 138.

On April 19, 1894 (91 Ohio Laws, p. 154; section 250—1, Rev. St.), it was enacted that every railroad company shall make out, under oath, and file with the Commissioner of Railroads and Telegraphs, on or before September 1st of each year, a true list of the names of each and every stockholder, giving the number of shares owned by him. A blank form of the reports to the Railway Commission now and in 1909 in use, affidavits showing the various railroad companies' ownership of stock in other companies in the years 1900, 1905, and 1910, a printed copy of the Railway Commission's report for 1909, and also certain portions of the Manual of Statistics for 1910, are offered in evidence. The blank form of report requires a disclosure of what the stockholding of each company is in another, what companies are controlled through stock ownership solely or jointly by the reporting company, and what lines have been practically absorbed or joined for operating purposes. As far back as 1900, the official published reports of the Commissioner of Railroads and Telegraphs show that railroad corporations, foreign and domestic, had holdings in Ohio companies so extensive, and approximately so nearly the aggregate issue of all of the stock of the controlled roads, and so shifting in amounts or from one owner to another, as to suggest that such holdings could not have resulted from the mere aiding of roads in process of construction. What the reports show prior to that date is not in evidence. The right to acquire and continue such holdings, in so far as the record discloses, has not been challenged except as to the domestic companies whose roads extend into the Hocking Valley coal fields. It is also shown that the Attorney General and certain prosecuting attorneys have, by the planting of suits, attacked such substantially or actually competing domestic coal roads and disputed the right of any of them to purchase stock in another, except as authorized by section 3300. It is also true that able lawyers have resisted such suits, and asserted, and still assert, the right of one of such companies to control another through stock purchases. Nor is it to be presumed that any of the railroad corporations have purchased the stock of others, except on legal advice.

Under the above-mentioned practice, in which it must be presumed the companies believed they had a right to indulge, vast sums (in one case alone more than $92,000,000) have been expended by foreign railroad corporations in acquiring the stock of others chartered and operating in Ohio. The questions raised as to the rule of comity and the effect of such practices need not now be finally determined. My excuse for considering them is the earnestness with which they were presented by counsel. The situation is such that this court can well afford to await, if it be practicable to do so, the action of the state's highest court, before declaring the Chesapeake Company's stockholdings not warranted by the rule of comity, and may well refuse to award an injunction on that ground until a full and final hearing.

I think it must follow, from the evidence submitted, that the use by the Chesapeake Company of the Hocking Company's line as an outlet to the Great Lakes will result in some interference with interstate commerce; but whether such interference will be insignificant, or merely incidental, and is not a dominant purpose of the company (Cincinnati Packet Co. v. Bay, 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428), or whether the necessary effect of the Chesapeake Company's control of the Hocking Company will be to stifle or directly and substantially restrict free competition, or whether such effect will be but incidentally and indirectly to restrict competition, while its chief result will be to foster the trade and increase the business of all the roads concerned (Union Pacific Coal Co. v. U. S., 173 Fed. 737, 740, 97 C. C. A. 578), are questions which ought not to be, and, I think, cannot satisfactorily be, determined on the evidence submitted, and should await a final hearing, at which all the facts may be developed and the witnesses subjected to the test of cross-examination. The evidence before me on this point and as to the arrangements made or to be made with the Lake Shore & Michigan Southern Railway Company, in my judgment, justifies further investigation and a full hearing.

If an additional issue of the Hocking Company's common stock be had, the Chesapeake Company will have the privilege of acquiring its proportionate share of it. Before its holdings are increased, it should be finally determined whether, under the facts of this case, it may lawfully acquire and hold any of the Hocking Company's stock.

Additional affidavits concerning the board of directors of the Hocking Company have been offered. At the last annual election of directors there were 213,631 votes cast out of a total of 260,000. No candidate received less than 213,619 votes. There were manifestly no contests. No protest or objection was made as to the conduct or validity of the election. As the shares held by the Trunk Line Syndicate numbered approximately only 70,000, it was impossible for their holders unaided to select directors. Had the 70,000 votes been rejected, the directors would still have received a majority not only of all the votes cast, but of all of the votes, had every share of stock issued been voted. If the complaining parties voted at that election—on this the record is silent—they cast their votes for the board which was declared elected. As vacancies occurred in the board, they were

filled in the manner prescribed by law and the regulations of the company. It will not, therefore, be enjoined from discharging the duties lawfully devolving on it.

The Hocking Company is paying interest at the rate of 5 per cent. on $2,500,000, borrowed for the purpose of retiring its preferred stock. Having express statutory authority to redeem or purchase back its preferred stock, it had the right to borrow money for that purpose, for, where a corporation has power to purchase its own shares, it may buy them on credit or may borrow money on mortgage, or otherwise, to pay for them. Machen on Corp. § 630; First Nat. Bank v. Salem Capital Flour Mills Co., 39 Fed. 89, 95, 96; Berger v. U. S. Steel Corp., 63 N. J. Eq. 809, 53 Atl. 68. Other items of expenditure to a considerable amount are shown, for which provision must be made. The Chesapeake Company is also paying interest on a large sum expended in stock purchases and is entitled to protection in a reasonable amount for such inconvenience and loss as it may sustain. The fact is not overlooked that, if common stock should issue, it would receive dividends, if they were earned. The bond should not be prohibitive to the prosecution of the suit, and yet should be adequate to reimburse the defendant companies should they prevail on the final hearing. I have concluded that, if a sufficient bond in the sum of $75,000, properly conditioned, be given within 10 days from the filing hereof, an injunction may go, until further order, enjoining the Hocking Company from issuing additional common stock and the Chesapeake Company from voting its stockholdings in such company for any purpose. On the failure to give such bond within the time named, the existing restraining order will stand dissolved.

The motion for a temporary injunction is granted to the extent above indicated. The motion to vacate the restraining order is overruled.